AUSTIN POLK AND BIZ WATTS V. THE STATE.

*No. 880.     Decided March 4th, 1896.*

1. **Continuance—Diligence.**

Where the indictment was presented on the 7th of April, 1893, and six terms of
court had intervened before the trial, an application for continuance, which alleged
that the witnesses were subpœnaed on the 20th day of April, 1893, and that, "at a
former term of court all of said witnesses were present," the term not being stated,
is too indefinite, and shows a total want of diligence to obtain the presence of the
witnesses, and the application for continuance was properly overruled.

2. **Identification of Defendant Upon the Trial—Charge.**

On a trial for murder, where the court had charged the jury that, "they must be-
lieve, beyond a reasonable doubt, from the evidence, that defendants, or either of
them, etc., did unlawfully and with malice aforethought, shoot with a pistol and
kill" the deceased; and, further charged them to find, before conviction, that defend-
ants, or either of them acting by themselves, or with H., committed the crime. Held:
That this required the proof to show that the parties on trial were the parties who
killed deceased; and, it was not error to refuse a requested instruction, to the effect,
"that the State must, in all cases, identify the defendant or defendants, as the case
may be, and point them out to the jury as the parties who committed the offense that
is under investigation," and especially so where there was no question but that the
defendants were the parties about whom all the witnesses were speaking when they
were alluded to.

3. **Murder—Circumstantial Evidence—Charge.**

On a trial for murder, where there was positive evidence of the participation in, or
such close juxtaposition of defendants to, the killing, it is not error to omit or refuse
to charge upon circumstantial evidence.

4. **Same—Evidence—Dying Declarations.**

On a trial for murder, where it appeared that, immediately upon receiving the
wound, deceased remarked to one of the defendants that, "he would get even with
him," but a short time thereafter stated that the wound was mortal, and continued
to make this statement up to the time of his death. Held: His declarations, as to
the killing, were admissible as dying declarations.

5. **Conflicting Evidence—Verdict—Practice on Appeal.**

The court, on appeal, will not disturb a verdict simply because the testimony was
conflicting, if there is sufficient evidence to warrant the verdict.

6. **Verdict as to Joint Defendants.**

On a trial of two joint defendants for murder, a verdict which read: "We, the jury,
find the defendants, Biz Watts and Austin Polk, guilty of murder in the first degree,

and assess their punishment at life imprisonment in the State penitentiary," is a separate finding as to the punishment of each defendant. Following, Mootry et al v. State, ante p. 450.

APPEAL from the District Court of Navarro.          Tried below before Hon. RUFUS HARDY.

This appeal is from a conviction for murder in the first degree, the punishment assessed being a life term imprisonment in the penitentiary.

The indictment charged Austin Polk and Biz Watts jointly, with the killing of Rufus Jamison, in Navarro County, on the 20th day of January, 1893, by shooting him with a pistol.

The record disarrest discloses, that one Mack Hughes, had also been indicted and tried for this murder, but does not state how his trial resulted.

The evidence adduced at the trial in this case is directly conflicting— that for the defense establishing a complete alibi for the defendants.

The evidence for the State established the following facts, viz: That on the night of the 20th of January, 1893, the deceased and defendants (all negroes) attended a "Literary" at the C. M. E. Church, at Corsicana, and the shooting occurred shortly after it broke up, and as the parties were returning from it to their homes.

Fred Myers, testified: "I know the deceased and know the defendants. Was with the deceased when he was shot. We had been down to the Literary at the C. M. E. church; went together from South Corsicana with the Parsons boys and George Flournoy. The Literary broke up a little after 10 o'clock. The Parsons boys started home with two girls, Emma Manning and Everline Travers; and we, Rufus Jamison, and myself, followed on behind them with George Flournoy and Charlie Thomas. When I came out of the church, I saw the three defendants standing at the corner of the church on the outside right hand near the steps. We went across the street, got on the opposite side of the street at the school yard. The defendants went on down the other side of the street. Rufus Jamison and I left George Flournoy and Charlie Thomas at the school yard corner near Noon Pillows, and we went on down by George Johnson's and around John Collins' corner to meet the Parsons boys. As we were going on down the street on the opposite side from the church, we stopped near Noon Pillows and defendants stopped on the other side opposite us. As we started on down the street, the defendants and Mack Hughes ran, in a stooping position, across the street to our side and got on the sidewalk in front of us not far from the corner at John Collins'. They turned the corner and ran into the bushes ahead of us. John Collins went in at his gate. Rufus and I walked on, and as we got within a few feet of the nearest bush to the road, I heard a pistol snap and told Rufus to look out, that was a pistol snap; he said he reckoned not. It snapped again and I stepped back. Rufus went towards the bush, peering at the party behind the bush, and said, "Don't shoot me, Mack Hughes, this is Rufe. This is Rufe, Mack." When he got almost in reaching distance of the party behind the bush, that party jumped up, ran back a few steps and fired. Then three shots

were fired in succession, and the third in succession, or the fourth in all, struck Rufe. Rufe then said, "That's all right, Mack, you shot me, but I'll get even with you." When the pistol snapped Rufus began to edge up towards the bush where the party was, and kept edging up towards him until the pistol fired; I kept going back the other way. After Rufe was shot, I said, "Rufe, did that nigger shoot you?" He said, "Yes," and I went up and took his arm and told him, we had better be going. Then some fellow, pretty tall, came down out of the bushes a little further up, and began firing at us. It looked like there was two other pistols firing. Rufe and I trotted along as fast as we could, around Collins' corner; slowed up as we turned the corner, as Rufe could not run any more. I asked Rufe if he was shot bad, and he said, "Yes, I am shot a dead shot." I said, "O, you ain't, is you Rufus?" He said, "Yes, I am, and Mack Hughes done it, and Austin Polk and Biz Watts was with him." We walked on towards town, and when we got to the school house corner, we saw George Flournoy and Charlie Thomas waiting for us. George asked what was the matter, and I told him Rufe was shot. We all went on to the bridge, and stopped to rest Rufe. We heard some more shooting, and a little while after that the Parsons boys came running up from that direction. The Parsons boys asked what was the matter, and we told them, and they said that somebody had just been shooting at them. We took Rufe up to Waymon Jones' and sent after a doctor and a carriage, and took Rufe home a little while after. The next morning I was over at Rufe's house, and Mack Hughes came to see Rufe. He asked Rufe if he knew who shot him. Rufe told him yes, that he, Mack, shot him and he knew it. Mack said that he did not do it, and asked Rufe how he could tell it was him in the dark, how he could tell him from the other fellows. Rufe told him he knew him, he was close enough to see him, and he knew it was him.

"When I was standing outside of the door when the meeting broke up, I saw Austin Polk kick a bucket or something at George Flournoy, and George told him to look out there. The defendants and Mack Hughes were standing on the outside at the right hand corner of the church, by the steps, after the 'Literary' broke up. I know it was them; saw them. Mack was unusually dressed up that night; had on swallow-tail coat, big red tie, and high collar; coat was dark and pants light. Austin had on overcoat. It was a starlight night; no moon. The shooting of Rufus Jamison occurred on January 20th, 1893, in Navarro County, Texas."

Ann Jamison, testified: "I am the mother of Rufus Jamison, deceased. Was at home the night Rufus was shot. He went to Literary. About 12 o'clock they brought him home shot. When they brought him in, I asked him if he was hurt bad, he said, 'Yes, ma, I'm shot a dead shot.' He said that Mack Hughes was the one that shot him, and that Austin Polk and Biz Watts were with him in the bushes, and were also shooting, but that Mack was the one that shot him. He said, that he saw

Mack in the bushes a few feet from the road, he and Fred were on; he first heard a pistol snap, then he edged up towards the bush behind which he saw somebody; the pistol snapped again and Mack Hughes rose up from behind the bush and backed off. He edged off as he edged up. He said he could almost grab him; that he knew it was Mack. He got so close to him that he (Mack) fell over a little bush. Next morning Mack came down to my house to see Rufe and said, 'Rufus did I shoot you?' Rufus said, 'Yes, Mack, you shot me, you know you shot me.' Mack then said, 'But how do you know it was me that shot you; how could you tell me from the other fellows?' Rufus said, 'I could tell you Mack; you know you shot me.' Rufus often, during his sickness, repeated that statement of the shooting. He never expected to live, and so stated several times to me, frequently at the same time declaring that it was the defendants and Mack Hughes that were doing the shooting that night. He made these statements to me before Mr. Mays came the next morning and took it down in writing; and he made them afterwards frequently. He was always in his right mind up to the time he died. Did not know anything about who shot him before he told me. Mr. Mays would ask him questions and as he would answer, Mr. Mays would write them down."

Richard Mays, testified: "On the morning of the 21st of January, 1893, the next morning after the shooting of Rufus Jamison, in Navarro County, and the State of Texas, I called in my official capacity to see him and take his dying statement. I was then County Attorney of Navarro County. I knew the statutes and requirements thereof for taking dying statements, and proceeded according to law. I used no persuasion and asked no leading questions, but simply asked him to tell me how the whole thing occurred, and who shot him. I told him who I was and what I had come for. He then told me about the affair, and I took it down in writing (witness was here handed a written statement, and asked if he recognized it). He stated that it was the statement that he took from Rufus Jamison; that it was in his handwriting. (The statement was here offered in evidence, and the witness read it to the jury as follows:)

"January 21, 1893. Rufus Jamison says: 'George Flournoy, Freddy Meyer, Charlie Thomas, Nelson Parsons and Alec Parsons and I had been to a Literary at the C. M. E. church. After it broke up, the two Parsons boys got company and started home, the balance of the boys, including myself, followed along behind them, so we could get together after they took the girls home. The reason why we did this was because we feared something would happen, as something of the kind had happened before. After we left the church, we saw three boys coming behind us, and we stopped to see who they were, and they passed us on the other side of the street, and I saw who they were. They were Austin Polk, Biz Watts and Mack Hughes, who had one eye. They walked on ahead of us for some piece, and after they had passed us they got on the same side of the street we were on, but kept ahead of us, and we saw them

turn out of the road into some bushes, in a run, when they stopped. At this time we were about fifty feet from them, and I heard them snapping what sounded like a pistol. I told Mack not to shoot, that it was me. Mack jumped up and started to run, and as he did, all three of the boys commenced shooting. I could tell that Mack Hughes was shooting at me, but could not tell which way Austin and Biz were shooting, but think they were shooting at the Parsons boys. I was looking at Mack Hughes, and had been talking to him before he shot me. Mack Hughes was the one that shot me. I know this. There were several pistol shots fired. I don't remember how many though, but all the boys were shooting. At the time of the shooting, it looked as if Austin, Mack and Biz were shooting at the Parsons boys who were with the girls, as well as me and the boys who were with me. This was on January 20, 1893, in Corsicana, Texas."

"We certify that we heard Rufus Jamison make the above statement of his free will and accord."

(Signed)        "J. L. TIPPIT.<br>G. PHIPPS."

[No brief for appellant has come to the hands of the Reporter.]

*Mann Trice*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—Conviction for murder in the first degree, and punishment assessed at confinement in the penitentiary for life. The indictment in this case was presented April 7th, 1893. This case was called for trial on the 5th day of November, 1895, but the trial did not begin until the 6th day of November, 1895. Appellants moved the court to continue the cause for the want of the testimony of a number of witnesses, setting forth the evidence expected to be obtained from said witnesses. In the application they state that said witnesses had all been subpœnaed on the 20th day of April, 1893, and that at a former term of court all of said witnesses were present. For Navarro County, there are three terms of the District Court for each year. The first term begins on the first Monday in April; the second, on the first Monday in July; and the third, the fourth Monday after the third Monday in September. At the time this indictment was presented the Act of 1889 was in force. When this case was called for trial the Act of 1893 was in force, which Act went into effect the first Monday in June, 1893. As above stated, the bill of indictment was presented on the 7th day of April, 1893. The June term of 1893, the August term of 1893, the January term of 1894, and the June term of 1894, and three other terms of the court, intervened between the filing of the bill and the term at which the cause was tried. Now, it will be noticed that the application states that the witnesses had been subpœnaed on the 20th day of April, 1893, and were present at a former term of the court. The term at which they were present is not stated. It may have been the June term, 1893, or some other. We are not informed. This demonstrates that there was no diligence used to obtain the presence of these witnesses,

and disposes of the motion to continue the cause. Appellant requested the court to instruct the jury "that the State must, in all cases, identify the defendant or defendants, as the case may be, and point them out to the jury as the parties who committed the offense that is under investigation." There is no question but that the appellants in this case were the parties about whom all of the witnesses were speaking when they were alluded to. We presume that appellants desired the court to intruct the jury that they must believe, or that it must be proved beyond a reasonable doubt, that these defendants were the parties engaged in the shooting, or in the murder. When we turn to the charge of the court, we find that by the fifth paragraph thereof the jury were required to believe "beyond a reasonable doubt, from the evidence, that the defendants, or either of them, * * * in Navarro County, on or about the 20th day of January, 1893, did unlawfully, and with malice aforethought, shoot with a pistol, and kill, Rufus Jamison." This required the proof to show that these parties were the parties who killed the deceased, and no jury could find, beyond a reasonable doubt, that they killed the deceased, without believing that these parties were the parties who did it, because the court instructed the jury to find, before conviction, "that the defendants, or either of them, acting by themselves or together with Mack Hughes," committed the crime. The charge upon this subject, when taken in connection with the charge upon alibi, amply presented the only issue in the case. Upon alibi the court charged "that each of the defendants claims that at the time of the shooting of Rufus Jamison, if he was shot, he, the said defendant, was at another and different place, and not at the place of the shooting. Now, if you believe this claim to be true, or have any reasonable doubt as to whether it may not be true, then you will find such defendant or defendants not guilty." There was no error in omitting to charge upon circumstantial evidence. There was positive evidence of the parties' participating in the main act, the killing; and, if not, the facts were in such close juxtaposition as rendered such charge unnecessary. The dying declarations of the deceased were admitted in evidence over the objections of the defendant. The objection was that there was hope of recovery remaining with the deceased when he made the declarations. It is true that immediately upon receiving the wound the deceased remarked to Mack Hughes that he would get even with him. But a very short time afterwards he stated to his companion that the wound was mortal. He continued to make this statement up to the time of his death. It is not questioned but that he was sane and rational. It is not pretended that questions were propounded leading him to make any particular statement. We are of opinion that the declarations were admissible. It is contended by appellants that the evidence is insufficient to support the conviction. A number of witnesses swear to facts which, if true, establish the guilt of the appellants beyond any question. A number of witnesses swear to facts tending to show an alibi for each defendant. There was a conflict in the testimony, and the jury settled it against appellants, and we cannot

disturb their verdict. The verdict of the jury is objected to because of its form. It reads: "We, the jury, find the defendants, Biz Watts and Austin Polk, guilty of murder in the first degree, and assess their punishment at life imprisonment in the State penitentiary." Just such a verdict as this was approved by this court in Mootry v. State, ante p. 450, decided at the present term of this court. The judgment is affirmed.

*Affirmed.*