# A. T. WALKER *et al.* v. STATE.

No. A-1258.   Opinion Filed November 18, 1912.

(127 Pac. 895.)

1. **COMMERCE—Subject to Regulation—Shipment of Intoxicating Liquor.** Any person residing or being within that portion of the state of Oklahoma which formerly comprised Oklahoma Territory has a right to purchase in another state and have shipped to him in this state intoxicating liquors, and have such liquors delivered to his residence or place of business for his personal use or use of his family, and such liquors are safe from interference by virtue of any state law until they reach their point of destination. This right is based upon and protected by the interstate commerce clause of the Constitution of the United States, and cannot be interfered with by any constitutional provision or law of any state.

2. **SAME.** No person or combination of persons can lawfully ship into this state intoxicating liquors as interstate commerce and use the depot at which they are received as the point of their destination and as a warehouse for the general distribution of such liquors. Any such shipments are liable to seizure by the state officers and such persons are subject to prosecution and punishment for a violation of the laws of the state.

3. **SAME.** For a statement of facts which sustain a conviction under the second syllabus of this case, see opinion of the court.

4. **TRIAL—Presumptions and Burden of Proof—Suppression of Evidence.** Where the state makes out a prima facie case against a defendant or defendants for a violation of the prohibitory liquor law, and there is any testimony in the possession of defendants which would constitute a defense to such case, the burden is upon such defendant or defendants to produce such testimony or to account for his or their failure to do so.

5. **PARTIES TO OFFENSES—Principals.** All persons who act together in the commission of an offense are guilty as principals, and should be prosecuted and convicted as such.

6. **EVIDENCE—Acts and Declarations of Conspirators.** Where two or more persons conspire together to commit an offense, all words spoken or acts done by either of such persons in pursuance of the common design to commit such offense are admissible in evidence against and bind all of such conspirators, it matters not whether they were present or had knowledge of the words spoken or acts done; provided only, that such words spoken or acts done were in pursuance of the common design of such conspiracy.

7.    **EVIDENCE—Weight and Sufficiency—Circumstantial Evidence.**
In order to warrant a conviction upon circumstantial evidence
alone, the circumstances proven and believed to be true by the
jury must not only be consistent with the guilt of the defendant,
but must also be inconsistent with his innocence.   When the jury
find beyond a reasonable doubt that this condition exists, it is
their duty to convict in such cases.

8.    **INTOXICATING LIQUORS—Unlawful Possession—Sufficiency of
Evidence.**   Where it is shown that a defendant or defendants have
obtained a United States license to sell intoxicating liquors, and
they are found in possession of such liquors, this makes out a prima
facie case against them, and, unless such prima facie case is re-
butted, the jury is justified in convicting such defendant or de-
fendants.

9.    **SAME.**   The amount of intoxicating liquors found in possession of
a defendant who is charged with having possession of the same
with intent to violate the prohibitory liquor law is not in itself
sufficient to support a conviction, but may be considered in con-
nection with all of the other evidence in the case, and, when so
considered in connection with such other evidence, it may assist
to establish the intent of the person having possession of such
liquors to violate the provisions of the prohibitory liquor law of
the state.

10.    **TRIAL—Verdict—Construction.**   Strict technical rules of construc-
tion should never be applied to the verdict of a jury.   Their
verdict should receive a common-sense construction, and, if it is
possible to arrive at the intent and purpose of the jury, the ver-
dict should be upheld.   For a verdict which is held not to be bad
for uncertainty, see opinion.

(Syllabus by the Court.)

*Appeal from County Court, Pottawatomie County;
Ross F. Lockridge, Judge.*

A. T. Walker and others were convicted of having in their
possession intoxicating liquors with the intention of selling, bar-
tering, giving away, and otherwise furnishing the same in viola-
tion of the prohibitory liquor law, and appeal.   Affirmed.

The appellants were charged with unlawfully having in
their possession intoxicating liquors, to wit, whisky and beer, for
the purpose and with the intention of selling, bartering, giving
away, and otherwise furnishing the same in violation of the pro-
hibitory liquor laws of Oklahoma.

V. A. Vogal testified:   That he was freight agent at the
Missouri, Kansas & Texas depot at Shawnee, and had served
in that capacity since December, 1909.   That as such agent he

had charge of handling the freight. That within 90 days prior to March 4, 1911, as such agent, the witness had received at such depot about 400 cases of liquor consigned to John Hall. That there were four gallons of whisky to each case, as shown by the labels placed on them in compliance with the federal law. That the witness knows it was whisky because the bills of lading called for whisky. That during said time witness had also received at said depot 180 barrels of beer consigned to the said John Hall. That these barrels were larger than sugar barrels, and weighed each about 250 pounds. That there would generally be ten items on a waybill. The items would be in two-case lots, which would make 20 cases to one waybill. This whisky and beer was delivered to appellants or to their drivers, who were operating under the name of the O. K. Transfer Company. The appellants would present bills of lading and then get the freight bill. The whisky was delivered to them on the freight bill. That some time in December appellant Walker came to the depot accompanied by a man who was represented to be John Hall. The man who was introduced as John Hall stated that he wanted to get busy with some liquor shipments, and wanted to know what the railroad company requirements were with reference to such shipments. Witness informed said party that he would have to make an affidavit that he had no federal license, and had no application pending for such license, and that the liquor so shipped was for his own personal and family use, and was not to be used in violating the laws of Oklahoma. That appellant Walker and the party represented as John Hall then left the depot, and said John Hall came back soon afterwards with the affidavit all made out. That the man said to be John Hall left the office, and witness did not know what became of him, but, before he left, he was informed that the liquor would not be delivered to appellants without an order from him each day, and said Hall stated he wanted the O. K. Transfer Company to handle the liquor for him. The appellants Al Walker, Bill Eslick, and Sam Leslie constituted the O. K. Transfer Company. That subsequent to said time, and before the 4th day of March, the railroad company had delivered to one of the counsel for appellants

from 80 to 100 orders from John Hall for the delivery of liquor to appellants, which orders had been delivered to counsel for appellants to be filed in court, and witness does not know what has become of them. The witness does not know whether the lawyer for appellants to whom they were delivered filed them in court or not, or what had become of them. Witness has not seen them since. Over the objection and exception of counsel for appellants, witness was then permitted to state that each of these orders, in substance, contained directions to the railroad company to deliver his freight bill to appellants, and were signed by John Hall, and these orders were presented by appellants or by persons who were employed by them, and to whom the liquors were delivered. That the witness never saw John Hall but once. That witness has no knowledge of what became of the liquor after being delivered to appellants. That the wagons of appellants would hardly ever take less than two cases of liquor at a time, and sometimes would take 20 cases of whisky. At one time there was as much as 130 cases of whisky and ten barrels of beer in that depot consigned to John Hall. Witness does not know where John Hall lives, and is not acquainted with any member of his family, never saw him before he was brought to the depot and introduced to witness by appellant Al Walker, and does not know his real name was John Hall, except that appellant Walker introduced him as John Hall. That witness has never seen said Hall since or any member of his family, or learned anything of his whereabouts. Witness never received any shipments of liquor to John Hall except that which was delivered to appellants. Each day witness required an affidavit to be filed that the liquor was for the personal and family use of John Hall, and would not be used in violating the laws of Oklahoma. The appellant Eslick brought most of these affidavits. He brought one every morning or every evening and that would last for the day's shipment, and, when it was filed in the morning, he would get as many as 20 cases of whisky a day. That this liquor would be consigned to John Hall at Shawnee and that no liquor was received consigned to John Hall at any other point.

T. A. Amos testified: That he was checking clerk in the freight depot of the Rock Island Railway Company at Shawnee. That some time in September or October, 1910, appellant Eslick came into the office with a man and introduced him to witness as Mr. John Hall. Hall stated to witness that he was going to locate in Shawnee, and possibly would have some business with the railroad company, and requested witness to explain the conditions under which the railroad company handled shipments of liquor, what the company required for the delivery of liquor, and wanted to know if he would have to come up and sign for every shipment. Witness explained the regulations, and Hall said this would be all right, and gave witness his signature with an indelible pencil, and also pen and ink for record. Hall stated that he wanted the O. K. Transfer Company to handle the business for him; that he would sign up the affidavits and have the O. K. Transfer Company haul the liquor. Witness subsequently had a conversation with the defendant Eslick, and informed him that the railroad company had furnished witness a list of persons holding federal liquor licenses, and that witness had refused to allow Leslie, one of the appellants, to sign the waybill because he had seen the name of appellant Leslie on the list of persons holding federal licenses. That appellant Eslick then said: "I will sign them." The waybills were signed "O. K. Transfer Company" by the person who received the liquor. Witness stated to said Eslick that he could not allow any of the waybills to be signed by any person who had his name on the list as holding a federal license, and stated to said appellant Eslick that, on this account, he was not willing to permit appellant Walker or appellant Leslie to sign any waybills for whisky, for both of their names were on the list furnished by the company as persons holding federal licenses. Appellant Eslick replied "all right"; that he would sign for such liquors. That this was just before the first shipments of liquor began to come in. Witness does not know where John Hall lives, and does not know whether he is a resident of Shawnee or not. That witness had never talked with any person who claimed to know John Hall except appellant Eslick. That he had seen a number of affidavits signed "John Hall," but did not

see him sign them. He only knows a man was introduced to him by appellant Eslick as John Hall.

W. E. Jones testified: That he was warehouseman of the Missouri, Kansas & Texas Railway Company at Shawnee. That prior to March, 1911, he had delivered to the O. K. Transfer Company in Shawnee shipments of whisky and beer, consigned to John Hall. That he knew the drivers of the wagons to whom the liquor was delivered, and they were in the employ of the O. K. Transfer Company. That once during this time the sheriff of Pottawatomie county was at the depot and a wagon belonging to the O. K. Transfer Company drove up to the depot. That the sheriff was in the depot at the time. That appellenant Leslie was on the wagon. The wagon was backed up to the depot. That appellant Leslie did not take anything off with him. That appellants had been in the habit of getting two or more cases of liquor at a time, sometimes more and sometimes less. Witness knew John Hall; was introduced to him by Sam Leslie, and that was the first acquaintance witness had with him. Witness does not know where he lives; was not acquainted with any of his family; does not know whether or not he resides in Shawnee; only knows that Sam Leslie told him the man's name was John Hall.

On the pivotal points in this case, the court instructed the jury as follows:

"No. 13. You are instructed that if you believe from the evidence beyond a reasonable doubt that the alleged John Hall does not in truth or in fact exist, and that the said John Hall is a fictitious person, or if you find that he did in fact exist, but that he was brought forth and used by defendants in order that they might use his name for the purpose of assisting them in the unlawful delivery of whisky as a blind and subterfuge, then and in that event you should find the defendant guilty.

"Given and defendants except.

"ROSS F. LOCKRIDGE, *Judge.*

"No. 14. You are instructed, further, that if you find from the evidence that the liquor in question had no fixed destination —that is, if you find that the depot of the Missouri, Kansas & Texas Railway station at Shawnee was used for storehouse purposes—and that the whisky in question was kept and detained there from time to time and delivered from there to various

points throughout the county of Pottawatomie or the city of Shawnee, and you further find that the destination to which the liquor was consigned was not the place of business or home of the said John Hall, should you find there is such a person as John Hall, then and in that event, if you find that the defendants knowingly assisted in receiving this liquor at the depot and delivered it to such places, you should find the defendant guilty.

"Given and defendants except.

"Ross F. LOCKRIDGE, *Judge.*

"No. 15. You are instructed that if the defendants, or any of them as partners or employees, entered into a general compact or plan, either express or implied, to receive beer and whisky or beer or whisky for John Hall, or any other person, and to aid or abet the said John Hall or such person in holding or having possession of the same in the county of Pottawatomie, Okla., with the intent to unlawfully barter, sell, give away, or otherwise furnish the same, with knowledge of such unlawful intent of said John Hall or such other consignee that each of said defendants entering such general compact or plan, or joining the same, whether as employee or partner thereto, with the knowledge aforesaid, would be a party to and liable for each and every act of the said John Hall, or of the other party to such general compact or plan, which would come within the scope of such general compact or plan, whether he directly committed such act or acts or whether present or absent.

"Given and defendants except.

"Ross F. LOCKRIDGE, *Judge.*"

The appellants were found guilty. The jury returned the following verdict:

"State of Oklahoma, Plaintiff, v. Al Walker, Wm. Eslick and Sam Leslie. Verdict. We, the jury drawn, impaneled, and sworn in the above entitled cause, do upon our oaths find the defendants guilty, as charged in the information, and fix their punishment by a fine of $500.00 and imprisonment in the county jail for a period of 90 days.

"G. C. HALEY, *Foreman.*"

Each of the appellants was sentenced to pay a fine of $500, and be imprisoned in the county jail for the period of 90 days. Appealed. Affirmed.

*Blakeney, Maxey & Miley,* for appellants.

*Smith C. Matson* and *E. G. Spilman,* Asst. Attys. Gen., and *C. P. Holt,* County Atty., for the State.

FURMAN, P. J. (after stating the facts as above). Any person residing or being within that portion of the State of Oklahoma which formerly comprised Oklahoma Territory has the undisputed right to purchase in another state and have shipped to him in this state intoxicating liquors, and have such liquors delivered to his residence or place of business for his personal use or use of his family, and such liquors are safe from interference by virtue of any state law until they reach their point of destination. This right is based upon and protected by the interstate commerce clause of the Constitution of the United States, and cannot be interfered with by any constitutional provision or law of any state. See *Roy Gastineau v. State,* 7 Okla. Cr. 512, 124 Pac. 464, decided June 15, 1912. But this does not mean that any person or combination of persons can ship into this state intoxicating liquors as interstate commerce and use the depot at which they are received as the point of their destination, and as a warehouse for the distribution of such liquors, and that such shipments of intoxicating liquors are protected from seizure, or that such persons are exempt from prosecution and punishment for a violation of the state laws on this subject. Any such construction would be a gross perversion of the Constitution and laws of the United States.

The case now before us presents two questions: First, Did the intoxicating liquors handled by these appellants constitute a *bona fide* interstate shipment? Second, Was the home or place of business of the said John Hall the point of their destination? The court clearly and fully instructed the jury as to the law on these questions. We seriously doubt if these instructions should have been given, because there is no testimony in the record which even suggests that the liquors handled by appellants constituted *bona fide* interstate shipments. Who is John Hall? Has he a family? Where does he reside? How did it happen that he

needed over 1,200 gallons of whisky and over 180 barrels of beer for his own personal use or the use of his family within 90 days? In what occupation is he engaged, and where is his place of business? Echo answers, Where? If these liquors constituted *bona fide* interstate shipments, the facts which would establish this were peculiarly within the knowledge of the appellants. It was therefore their duty, in the light of the evidence in the case, to offer this testimony to the court and jury. Even if ignorance of the law was an excuse, appellants are not in a condition to offer this as a matter of defense, because counsel who represent them are recognized as among the ablest in the state. If any such man as John Hall really existed, appellants should have placed him on the witness stand, or accounted for their failure to do so. If the liquors were purchased in good faith by John Hall, in view of the testimony for the state, appellants should have taken the depositions of the parties who made the shipments and proved by them to whom the sales were made, who paid for the liquors, who advanced the freight rates for the shipments on such liquors, and any other facts tending to show the good faith of the transactions. It would be a reflection upon the intelligence and fidelity of counsel for appellants to presume for a moment that they did not know that this evidence would be important, if not necessary, to their clients. If such testimony existed, common experience teaches us that it would have been produced; yet we find that on these vital questions the record is as dumb as an oyster, and as silent as the grave. The failure of appellants to offer such evidence, in view of the nature of the testimony against them, amounts almost to a confession on their part that no such evidence existed, and that in truth and in fact the liquors handled by them did not represent *bona fide* interstate shipments, and that the entire transactions in which they were engaged only constituted a transparent and utterly indefensible device to evade and defeat the laws of Oklahoma. If such a man as John Hall really existed and resided in Shawnee, it is exceedingly strange that only three witnesses had ever seen him, and they did not know him of their own personal knowledge, but only from representations made to them by these appellants.

V. A. Vogle testified: That some time in December, 1910, appellant Walker came to the depot of the Missouri, Kansas & Texas Railway Company in Shawnee, and introduced to witness a stranger as being John Hall. Witness had no personal knowledge of said John Hall; did not know where he lived; was not acquainted with any member of his family; had never seen said party before or since or learned anything as to his whereabouts.

T. A. Amos testified: That in September or October, 1910, appellant Eslick came into the freight depot of the Rock Island Railway Company at Shawnee with a stranger, and introduced him to witness as John Hall. Witness did not know where John Hall lived, or whether he resided in Shawnee or had a home in Shawnee. That witness had never talked to any person who claimed to know John Hall, except appellant Eslick. He only knew that man was introduced to him as John Hall by appellant Eslick.

Witness W. E. Jones testified that a man had been introduced to him as John Hall by appellant Sam Leslie. Witness did not know where he lived, and was not acquainted with any member of his family. He only knew that appellant Sam Leslie told him that the man's name was John Hall.

The record shows that on each day during which the transactions described therein took place appellants delivered to the railway company an order purporting to be signed by John Hall for the delivery of intoxicating liquors received that day, and also an affidavit purporting to be executed by John Hall to the effect that such liquors were for his own personal use and use of his family, and were not to be used in violating the laws of Oklahoma. It therefore appears, according to the representations of appellants, that, as long as the existence of the said John Hall was necessary to enable them to carry out their plans, the said John Hall was a living reality, but that, as soon as appellants were called to account for their conduct, the supposed John Hall became as intangible and invisible as thin air. If they could daily produce an order and affidavit from him to enable them to obtain possession of the intoxicating liquors, how does it happen that

when they are called upon to account for their conduct, and when the county jail and a severe fine is staring them directly in the face, the said John Hall vanishes from the scene of action like the baseless fabric of a vision? Who saw John Hall during all of this time? Where and why did he keep himself concealed, and where is the notary public who took the acknowledgments to these affidavits? What has become of these affidavits? The state had a subpoena served upon the witness Vogle to produce at the trial of this cause all of the papers in his possession pertaining to this matter to be used as testimony in behalf of the state, but the witness turned a great number of these papers over to one of the counsel for appellants, as the witness says, to be filed in court, which was never done. Why was this not done? This cannot be considered otherwise than as a strong circumstance against appellants. We deem it due to state that the counsel who now represent appellants did not represent them in the trial court.

If the intoxicating liquors handled by appellants as the property of John Hall constituted *bona fide* interstate shipments, why was it that appellants did not prove by their wagon drivers that such liquors were delivered in good faith to the home or place of business of the said John Hall? Why this secrecy and this concealment? How can it be said that innocent men, with almost certain conviction staring them in the face, could have such evidence in their possession and neglect, fail, and refuse to present it? Their neglect in this respect is a most convincing circumstance against them. Again, if appellants did not know that they were violating the law, why did they not deliver all of the liquors received in one day in one load? Why did they make five or ten loads out of what they could and should have hauled in one load? Were they trying to rob John Hall by multiplying the trips, or were they trying to defeat the law? The jury took the latter view of the matter, and we cannot say that there is no evidence to support their verdict.

If the appellants were engaged only in handling *bona fide* interstate shipments of liquors to the home or place of business of John Hall, why was it necessary for appellant Walker and

Leslie to obtain a United States license to sell intoxicating liquors? The appellants were all engaged in a common design to accomplish a common purpose, and, when appellant Eslick was informed that his codefendants Walker and Leslie would not be permitted to sign for the liquors they received because they and each of them had a United States license for the sale of intoxicating liquors, appellant Eslick not only did not deny the charge, but acquiesced in it, and said he would sign for such liquors. Under these conditions, the statement of Eslick bound his associates, for it is the law that, where two or more persons engage in a common design to do an unlawful act, they are all responsible for what is said and done by their co-conspirators in pursuance of this common design to effect a common purpose. See *Holmes v. State,* 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300. Conspiracies to violate the law are always secret, and every effort is made at concealment. Therefore, such conspiracies can only be proven by circumstantial evidence.

The evidence brought knowledge squarely home to Eslick that those with whom he was acting in pursuance of a common design were charged with being in possession of a United States license to sell liquor. To say the least of it, it then became the duty of these parties to offer some testimony either denying or explaining this matter. Notice to Eslick was notice to Walker and Leslie, with whom he was acting. Men can bind themselves with conduct as well as by words. In fact, it is an old adage that actions speak louder than words. Silence gives consent. This is especially so where the circumstances are such that a reasonable man would speak out and deny a charge if it were not true. Admissions against interest often constitute the highest and most incontestable character of legal evidence, and obviate the necessity of offering direct evidence as to any question or fact which is tacitly admitted either by language or conduct. The fact that appellants knew that the railroad company would not permit Walker and Leslie to sign for and receive the liquors upon the ground that such conduct would be illegal because of their possession of a United States license to sell liquor, and the want of

denial or explanation on their part to this charge, amounts almost to a confession of guilt. The fact that there is no testimony that Eslick had a United States license to sell intoxicating liquor cannot avail him, for persons who knowingly act with those who are violating the law are just as guilty as those with whom they act. This fact, in connection with their possession of intoxicating liquors, made out a *prima facie* case against them. They offer no explanation to this *prima facie* case. Conscious guilt is the only reasonable explanation of their failure to offer any evidence in their defense. If such evidence existed, it was within their power to produce it. Their failure to do so amounts almost to a plea of guilty. It fully warranted the jury in finding a verdict of guilty, and this court would stultify itself in setting aside a conviction supported by the evidence in this record and to which no defense has been made.

In connection with the other facts in this case, the amount of liquors handled by appellants during this time creates a very strong presumption against them. In the case of *Johnson v. State,* 6·Okla. Cr. 491, 119 Pac. 1019, this court said:

"We are of the opinion that the amount of intoxicating liquor found in possession of a defendant is a proper circumstance to be considered by the jury in connection with the other facts and circumstances of a case in determining as to whether or not it was the intent of the person having possession of the liquor to illegally dispose of the same in violation of the prohibitory law of the state, but this circumstance alone cannot support a conviction."

There are a number of other incriminating circumstances in evidence against the appellants, all of which, taken together, are incapable of explanation, except upon the ground that they are guilty. The rule in cases of circumstantial evidence is that, in order to warrant a conviction, the circumstances proven and which are believed to be true by the jury must not only be consistent with the guilt of the accused, but must also be inconsistent with his innocence, and, when this condition exists, it is the duty of the jury to convict. See *Ex parte Jeffries,* 7 Okla. Cr. 544, 124 Pac. 924. It is inconceivable that men would fail to offer any testimony in explanation of the circumstances in evidence

against them in this case, if the circumstances were capable of explanation, consistent with their innocence.

Third. Appellants contend that the verdict in this case is void for uncertainty, in that it does not appear which one of the appellants the jury intended to convict, or as to whether the jury intended the punishment to be joint or several. The verdict is as follows:

"The State of Oklahoma, Plaintiff, v. Al Walker, Wm. Eslick and Sam Leslie. Verdict. We, the jury drawn, impaneled, and sworn in the above-entitled cause, do upon our oaths find the defendants guilty, as charged in the information, and fix their punishment by a fine of $500.00 and imprisonment in the county jail for a period of 90 days. G. C. Halley, Foreman."

We do not think that the contention of counsel for appellants is tenable. The appellants were all jointly charged, prosecuted, and tried together, and the court instructed the jury that they might convict or acquit any one or all of the appellants, and that it was their duty to acquit any one of the appellants as to whose guilt they entertained a reasonable doubt, and to convict only those of the appellants whose guilt was established by the testimony to their satisfaction beyond a reasonable doubt. In the caption of the verdict, the name of each appellant appears, and the verdict is against the defendants in the above-entitled cause. This makes the title of the case a part of the verdict. We think that from the entire record there can be no question but that the jury intended to convict each one of the appellants. There is nothing in this record to raise a reasonable doubt upon this subject. There are no degrees in the offense of which the appellants were convicted, and there can be no such a thing as a verdict in a criminal case assessing a joint punishment under our law against two or more defendants. We are aware of the fact that some courts have decided that a verdict such as the one before us is bad for uncertainty, but this court is not hunting excuses to set aside verdicts of juries and judgments of courts to turn guilty men loose. But, on the contrary, we believe that a technical construction should never be placed upon the verdict of a

jury, but that it should receive a common-sense construction, so as to enforce the evident purpose of the jury.

We are not without authority in support of our views on this matter. In the case of *Mootry & Rolly v. State,* 35 Tex. Cr. R. 450, 33 S. W. 877, 34 S. W. 126, the appellants were jointly tried and convicted of the crime of murder. The verdict was:

"We the jury, find the defendants, Mat Mootry and Albert Rolly, guilty of murder in the first degree, as charged in the indictment, and assess their punishment at death."

The court said:                ,

"There is no set form or words in which a verdict is required to be written. Therefore, the only rational general rule that can be adopted by which to measure its sufficiency is, Does it show clearly, and without any doubt, the intention of the jury, and their finding on the issues presented to them? If it does, it cannot be declared bad without sacrificing substance and justice to form. No error that is not a violation of some positive rule of law, which may possibly prejudice the defendant, can be a ground for reversal on appeal. See *State v. Ryan,* 13 Minn. 374 (Gil. 343). No one on reading said verdict would question for a moment that the jury intended thereby to assess the punishment of each of said defendants at death, and the language used, to our minds, imports that idea, and is inconsistent with any other reasonable construction; and, entertaining that view, we hold *t*he verdict good, as finding each of the defendants guilty of murder in the first degree, and assessing the punishhment of each at death."

We also find in the case of *Polk & Watts v. State,* 35 Tex. Cr. R. 495, 34 S. W. 633, a case directly in point. The defendants were jointly indicted for murder. The verdict of the jury was as follows:

"We, the jury, find the defendants, Biz Watts and Austin Polk, guilty of murder in the first degree, and assess their punishment at life imprisonment in the state penitentiary."

The opinion is by Judge Hurt, and the judgment of the lower court was affirmed without argument.

The case of *J. E. Davidson & J. B. Thompson v. State,* 40 Tex. Cr. R. 285, 49 S. W. 372, 50 S. W. 365, is also in point. In that case the appellants were jointly indicted, charged with theft of one head of cattle. The verdict was as follows:

"We, the jury, find the defendants' plea of former conviction untrue, and find them guilty as charged, and assess their punishment at two years' confinement in the state penitentiary. R. H. Hervey, Foreman."

In considering this case the court said:

"Whatever may have been the rule heretofore in reference to the construction of verdicts of this character, we hold that such a verdict as the one rendered in this case is not now subject to the criticism made to the same by appellants' counsel. As stated by the court in the case of *Mootry v. State*, 35 Tex. Cr. R. 457 (33 S. W. 879) : 'That is certain which can be made certain.' A bare inspection of the verdict in this case shows that the jury intended to assess a punishment of two years' confinement in the penitentiary against each of the appellants. The judgment rendered thereon is in direct response to that verdict. In the Mootry case, *supra*, the verdict there rendered was death upon Mootry and Rolly; but we understand the effect of the decision in that case is to overrule the previous decisions of this court, holding verdicts of a similar kind to the one here under discussion void. A fair construction of the verdict in this case will indicate that the jury intended to inflict upon each of the appellants the punishment of two years' confinement in the state penitentiary. In the consideration of a verdict, the first object is to ascertain what the jury intended to find; and this is to be done by construing the verdict liberally, with the sole view of ascertaining the meaning of the jury, and not under the technical rules of construction which are applicable to pleading. *Miller v. Shackleford*, 4 Dana (Ky.) 271; *May v. Lewis*, 4 Tex. 38. And, where the intention of the jury is to be considered, it becomes the duty of the court to disregard a mere clerical error. *Jeansch v. Lewis*, 1 S. D. 609, 48 N. W. 128. The reasoning in the Mootry case, *supra*, is cited with approval in the case of *Polk v. State*, 35 Tex. Cr. R. 495 (34 S. W. 633). We cannot agree with the contention of appellant's counsel that the verdict of the jury is void, as contended in their motion for rehearing."

We also find the case of *Alejos Garza et al. v. State*, 43 Tex. Cr. R. 499, 66 S. W. 1098, in point. In that case three appellants were jointly indicted, prosecuted, and convicted for theft of cattle. The verdict of the jury was:

"We, the jury, find the defendants guilty as charged in the indictment, and assess their punishment at three years' confinement in the state penitentiary."

The court said:

"The verdict of the jury found defendants guilty, and assessed their punishment at three years' confinement in the penitentiary. The court entered judgment on this verdict of three years against each of the defendants and so pronounced the sentence. Exception was reserved to this on the theorry that it was a joint verdict, and not a separate verdict, as to each. Some of the older cases so hold, but this has not been the rule since the case of *Mootry v. State,* 35 Tex. Cr. R. 457 (33 S. W. 877); *Polk v. State,* 35 Tex. Cr. R. 495 (34 S. W. 633). And especially see *Davidson v. State,* 40 Tex. Cr. R. 285 (49 S. W. 372, 50 S. W. 365)."

We could cite a great number of authorities to the same effect, but will confine our citations to the Texas court alone, as that court is universally recognized as the most technical court in the United States in behalf of defendants.

Upon a review of the entire record, we have no doubt but that the jury has arrived at the proper verdict in this case; that, while some of the instructions of the court may not be above criticism, yet, as the verdict is right upon the entire record, the judgment of the lower court will be affirmed.

DOYLE, J., concurs; ARMSTRONG, J., absent, and not participating.