ALVIN WOOTEN v. STATE.

No. A-9684.   Sept. 25, 1940.
(106 P. 2d 132.)

W. L. Boner and Rob't N. Allen, both of Durant, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Bill Steger, Co. Atty., of Durant, for defendant in error.

BAREFOOT, J. The defendant, Alvin Wooten, was charged by information filed in Bryan county with the larceny of cattle; was tried, convicted, and sentenced to serve a term of five years in the penitentiary, and has appealed.

The conviction of the defendant, Alvin Wooten, grew out of the larceny of two head of cattle: "One three year old brindled white face steer; one pale red face, one year old bull," the property of Granville Baxter, a resident of Bryan county. The record reveals that these cattle, together with other cattle belonging to Mr. Baxter, had been placed in the "Turnbull pasture" in Bryan county about 30 days prior to the larceny on the 29th day of April, 1937. They were in the charge of Mrs. Turnbull; and she had

given the defendant, Alvin Wooten, who farmed upon the premises, the sum of $1 per day to look after and take care of the cattle.

During the years of 1936 and 1937 a great many cattle had been stolen in Bryan county. This had become so extensive that at some time, the date not being quite clear as shown by the record, the cattle owners and raisers of that county organized a Cattlemen's Association, one of the purposes of which was to assist in the apprehension of those who had been stealing cattle in that and surrounding counties.

The evidence reveals that Ruel Taylor, who was for many years sheriff of Bryan county and who had been employed in the Criminal Bureau of Identification in Oklahoma City, had been appointed by the Governor and stationed at Durant to be of special assistance in the apprehension of cattle thieves. The record also reveals that money was subscribed by members of the Cattlemen's Association to assist in this work; but the salary of Mr. Taylor was paid by the state. In carrying on his work, Mr. Taylor had contacted Fat Cummings, a former convict who had served several terms in the penitentiary, one for the larceny of cattle, to assist him in his work. As a result of this employment of Cummings, the defendant was charged in two cases with the larceny of cattle, one of the cases being the case here under consideration; the other case has been tried, and the defendant was acquitted.

The evidence reveals that out of the employment of Cummings by Taylor, he had approached the defendant, Alvin Wooten, and he had agreed to steal cattle, and especially the cattle in question; and Cummings reported this agreement to Taylor and informed him of the date and the place. Taylor then contacted one Earl Smith, who bought and sold cattle at Durant and who owned a truck,

and made arrangements for him to meet Wooten and arrange the details of the stealing of the cattle.

Earl Smith had contacted Taylor prior to that time, and after talking with Cummings; and Taylor made arrangements with Smith to go in his truck and help steal the cattle, with the understanding that when he brought them to Durant he was to deliver them to the pens of one M. L. Banks with whom Taylor had made arrangements to take care of them until the owners were located.

The witness Earl Smith testified that in compliance with the agreement on the evening of April 29, 1937, he and his son-in-law, Leon Duncan, proceeded with the truck to the Turnbull pasture, and there in the nighttime met the defendant, Alvin Wooten; and the two cattle above described were stolen and put in the truck and brought to Durant, where he immediately contacted Ruel Taylor, who went with him to the Banks pens; and the cattle were unloaded there at 10:30 at night. He further testified that the understanding between him and the defendant was that they were to divide the proceeds of the sale of the cattle equally, and that the night they were stolen he estimated what they would bring and offered the defendant his half at that time; but the defendant told him, "No," that he would be in town Saturday, and he could pay him at that time; that defendant came on Saturday and he paid him $20 or $30.

The money paid by Smith to the defendant was money that had been furnished by Taylor; and the inference is that it was money that had been subscribed by the Cattle Raisers Association.

To show the relationship between the witnesses Taylor, Cummings, and Smith, this evidence from the record is quoted:

Witness Ruel Taylor testified:

"Q. Tell what connection Fat was to play in the matter of apprehending cattle thieves. A. He came and told me that they were going to steal some cattle. Q. Did you consider him to assist or aid you to apprehend people that were stealing cattle? A. Yes. Q. Now, tell the court and jury what, if any, arrangements you made with him as to what work he was to do? A. He was to let me know when they would steal these cattle and who they was and where they was going to take them to. * * * Q. How long had this partnership with Fat been before this occurred? A. This particular case? We had some more beside this. I don't know, three or four months or five, I guess. Q. Fat had been in the penitentiary prior to that? A. Oh, I think two or three times. * * * Q. He had been in your employ three or four months? A. Probably so. Probably three or four months. * * * Q. And Fat was the stool-pigeon that you picked up? A. Yes, sir."

The defendant on the witness stand in his own behalf denied all the testimony in substance herein above detailed. He stated that he did not participate in the stealing of the cattle and had no knowledge that they had been stolen until his arrest.

He produced six witnesses in his attempt to prove an alibi, his alibi being that he was with a fishing party on Boggy creek on the night the witnesses state the cattle were stolen. The witnesses who testified as to the alibi were not certain as to the date and were much confused on cross-examination. However, this question was for the jury; and the jury having found the defendant guilty, it would not be considered by this court.

The defendant also produced a number of witnesses who testified to his previous good character and reputation prior to the filing of these charges.

An examination of the record reveals that defendant was unable to pay for a transcript of the record for an appeal; that he was a tenant farmer with a family of eight children, the oldest 15 years of age; one child was born

during the trial of this case; and he was unable to hire a doctor to attend his wife. He was unable to pay his lawyer who represented him in the trial below; and for some reason undisclosed by the record, no brief has been filed in his behalf and none has been filed by the state. It is an established rule of this court that where no brief has been filed by the defendant, this court will examine the record; and unless some fundamental error appears, which would deprive the defendant of a fair and impartial trial, the case will be affirmed. With this rule in mind, we have carefully examined this record.

At the close of this trial, counsel representing the defendant presented to the court two requested instructions, the first of which requested the court to instruct the jury upon the question of "entrapment" as disclosed by the evidence heretofore noted. It is unnecessary to quote this instruction in full. The second requested instruction presented to the jury the question of "accomplice," and that if the jury found the witness Earl Smith to be an accomplice, it would be necessary that his evidence be corroborated. The trial court refused to give either of the requested instructions; nor did he, in the general instructions given, refer to the question of "entrapment" or to "accomplice."

Under the evidence as revealed by the record we are of the opinion that the defendant was either entitled to the instruction upon the question of "entrapment" or upon the question of "accomplice," and probably entitled to both of them. We think that the refusal of the court to so instruct the jury under the evidence was fundamental error and requires a reversal of this case.

The case of Shouquette v. State, 25 Okla. Cr. 169, 219 P. 727, 731, in an opinion of Judge Bessey, fully discusses

the question of "entrapment." It is unnecessary to quote from the same at length. Many of the facts in that case are identical with the facts in the case at bar.

Under the evidence here, there can be no question but that the witness Cummings was employed at the suggestion of Ruel Taylor, and that he was paid for his services by the fund raised by the Cattle Raisers Association; that he was the instigator of the plan and scheme for the defendant to commit the larceny, and that he had the witness Earl Smith contact the defendant and make plans to carry out the larceny as planned by Cummings. It is a recognized rule that under certain conditions it becomes necessary to use stringent methods for the apprehension of those who violate the law. The general rule in cases of this character is expressed in the Shouquette case, supra, when the court said:

"Ordinarily, it is not against public policy for officers to set a trap for one suspected of planning the commission of a crime, and if he commits the crime, even though aided or encouraged by the officer who laid the trap, the fact that he was so entrapped will be no defense. This rule will not apply, however, where the decoy proposed a robbery, and was the chief moving actor in the forcible taking of the property. To hold the aiding offender criminally responsible, he must have participated in every ingredient of the offense charged. 1 Brill, Enc. Crim. Law § 187; Woo Wai v. United States, 223 F. 412, 137 C. C. A. 604; Roberts v. Territory, 8 Okla. 326, 57 P. 840; People v. McCord, 76 Mich. 200, 42 N. W. 1106; United States v. Echols (D. C.) 253 F. 862; Brill, supra, § 188; State v. Currie, 13 N. D. 655, 102 N. W. 875, 69 L. R. A. 405, 112 Am. St. Rep. 687."

See, also, Warren v. State, 35 Okla. Cr. 430, 251 P. 101; Rider v. State, 53 Okla. Cr. 393, 12 P. 2d 552.

The facts in the case at bar come within the rule announced in the above case. There can be no question but

that Fat Cummings was employed by Officer Ruel Taylor, and that he was the instigator of the deal for the stealing of the cattle by the defendant; that the defendant would not have acted had he not planned and outlined the same. It was Cummings who put the defendant in contact with Smith; and there can be no question as to the contact between Cummings and Officer Taylor.

The case of Woo Wai v. United States [223 F. 415, 137 C. C. A. 604], above cited, announces the true rule:

"We are of the opinion that it is against public policy to sustain a conviction obtained in the manner which is disclosed by the evidence in this case, taking the testimony of the defendants to be true, and that a sound public policy can be upheld only by denying the criminality of those who are thus induced to commit acts which infringe the letter of the criminal statutes."

The distinguishing element is: Did the criminal intent to commit the offense have its origin in the mind of the defendant or the officer? This whole record discloses that the commission of this crime was first created by the witness Cummings, who was employed by Officer Ruel Taylor, and not in the mind of the defendant. To say the very least, this issue was raised, and the court should have submitted this question to the jury when properly requested by written instruction.

Further, in the Shouquette Case, supra, the court said:

"Gustafson and Brown were peace officers—officers of the court—who were in part responsible for this alleged robbery. So frequently it has been demonstrated, and the facts in this case again demonstrate, that the practice of employing one thief to catch another, by participating with him in the commission of the offense, is of doubtful propriety. It is a bad investment, financially. Plans like this to entrap bank robbers are often, as in this case, executed at the expense of insurance companies that write burglary insurance, and under such circumstances, where

a private detective, in conjunction with officers of the court, acts as a decoy and is himself the chief instigator of and performs the major part of the offense, such scheme will be deemed to be against public policy, constituting a good defense against the conviction of any who were induced to participate, and who would not have participated without such inducements. *Persons with criminal inclinations may never commit crime where no favorable opportunities are presented, and persons of that character should not be encouraged in the commission of crime by private detectives or by officers of the law.* The evils resulting from such practice outweigh the good that may be accomplished."

Just so in this case, it is very doubtful if this defendant, who was a very poor man and was receiving $1 per day for the taking care of the cattle stolen, would ever have conceived the idea of committing this crime unless encouraged in the commission of the same by the witness Cummings, who had been to the penitentiary at least twice.

It is, however, not necessary for this court to pass upon this question. If we were passing upon the sufficiency of the evidence to convict the defendant after a verdict by the jury, this case would not be reversed; but the evidence as shown by this record was such that the issue of entrapment should have been by the court submitted to the jury, and the same is true upon the question that the witness Earl Smith was an accomplice of defendant, as stated in the Shouquette Case:

"An instruction of this character was offered, but refused by the court. The instruction offered did not correctly state the law, but it was sufficient to call the court's attention to the issue of consent or lack of consent, making it the duty of the court to advise the jury as definitely as possible upon that issue."

The same is true in the case at bar. The requested instructions did not clearly state the law, but they did state the issue; and the court should have properly charged

the jury upon the question of "entrapment," or upon the the question of "accomplice," as was developed by the evidence in the case.

The jury which tried this case evidently had such ideas in their mind. When the verdict was rendered in the case, finding defendant guilty and assessing his punishment at five years in the penitentiary, they also rendered another verdict which reads as follows:

"We, the jury duly impaneled and sworn in the above entitled case, do upon our oaths, recommend the court to suspend the sentence given defendant, during good behavior."

This verdict under the law was not proper nor binding upon the court; yet, at the same time, it should not militate against the defendant. If the court had properly instructed the jury as above indicated, it is quite likely their verdict would have been different. Estes v. State, 35 Okla. Cr. 335, 250 P. 809; Walker v. State, 11 Okla. Cr. 339, 127 P. 895; Teel v. State, 53 Okla. Cr. 200, 11 P. 2d 197; Knopp v. State, 49 Okla. Cr. 416, 295 P. 228.

We are of the opinion that the court committed fundamental error in refusing to properly instruct the jury as above set forth, and for this reason the judgment of the district court of Bryan county is reversed.

DOYLE, P. J., and JONES, J., concur.