2011 OK CR 9

Jose Salome Guizar **SORIANO**, Appellant,

v.

**STATE of Oklahoma, Appellee.**

No. F–2009–579.

Court of Criminal Appeals of Oklahoma.

Feb. 16, 2011.

384

Matthew R. Orendorff, William K. Orendorff, Attorneys at Law, Sallisaw, OK, attorneys for defendant at trial.

Marion Fry, Margaret Nicholson, Assistant District Attorneys for LeFlore County, Poteau, OK, attorneys for the State at trial.

Virginia Sanders, Appellant Defense Counsel, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Loris S. Carter, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

A. JOHNSON, Presiding Judge.

¶ 1 Jose Salome Guizar Soriano, Appellant, was charged and convicted of two counts of Unlawful Delivery of a Controlled Drug (methamphetamine), under 63 O.S.Supp.2005, § 2–401(B)(2) (Counts I and IV), and two counts of Trafficking in Illegal Drugs (methamphetamine), under 63 O.S.Supp.2007, § 2–415 (Counts II and III), in a jury trial held before the Honorable Danita G. Williams, District Judge, in the District Court of LeFlore County, Case No. CF–2008–187A. The Honorable Danita Williams sentenced Soriano as follows: imprisonment for 10 years and a $20,000 fine on Count I; imprisonment for 20 years, to be run consecutively with Count I, and a $100,000 fine (with $50,000 suspended) on Count II; imprisonment for 20 years, to be run concurrently with Count II, and a $100,000 fine (with $50,000 suspended) on Count III; and imprisonment for 10 years, all suspended but run consecutively to Counts II and III, and a $20,000 fine on Count IV.[1] Soriano is properly before the Court on direct appeal.

### FACTS

¶ 2 On January 24, 2008, Jason Tucker, an agent with the Oklahoma Bureau of Narcotics and Dangerous Drugs, purchased approximately 3 grams of methamphetamine from Defendant Jose Salome Guizar Soriano. Tucker testified that he was the case agent in an investigation of drug trafficking by Jose Soriano.[2] The purchase was set up through the assistance of a confidential informant, whose identity was revealed at trial to be Georgina Sue Carreras. Carreras set up the deal with Soriano, who agreed to meet her and "her friend" (Tucker) near the laundromat at the All Star Center in Poteau, Oklahoma, in order to sell the friend methamphetamine.[3] When Soriano pulled up, Tucker and Carreras approached him; and Soriano and Carreras spoke briefly in Spanish. Carreras introduced Tucker to Soriano as "B.J." and told Tucker she needed $300. When Tucker asked, "You got it?" Soriano told him not to worry about it and indicated that he had something in his fist. After Tucker handed him $300, Soriano gave Carreras a clear plastic baggie containing a white crystalline substance, which she immediately gave to Tucker and which field-tested as positive for methamphetamine.[4] After the exchange Tucker told Soriano, "If it's good, I'll do business with you."

---

1. The jury's verdicts were imprisonment for 10 years and a $20,000 fine on Counts I and IV and imprisonment for 20 years and a $100,000 fine on Counts II and III. None of these sentences are subject to the "85% Rule" under 21 O.S. Supp. 2007, § 13.1 or 63 O.S.Supp.2007, § 2–415(D)(4).

2. Although a similar earlier statement by Tucker was objected to and struck by the trial court and forms the basis for a Proposition II challenge by Tucker—this later statement came in without any defense objection.

3. Carreras initially called Soriano's cell phone around 11:30 a.m., while in the presence of Tucker and other officers, to set up the deal. When Soriano was late getting to the agreed meeting spot, Carreras sent him several text messages to see if he was coming and when he would arrive.

4. The net weight of the plastic baggie containing the crystalline substance was 3.33 grams. Subsequent testing revealed the crystalline substance to be 33.0% methamphetamine.

¶ 3 On February 5, 2008, Carreras, Tucker, and other officers again met to set up a methamphetamine purchase from Soriano. This time Carreras called Soriano and asked him to sell "an ounce" for $1600. In a second call from Carreras, Soriano agreed to do so and to meet at "the laundry" again. Tucker and Carreras were waiting near the laundromat when Soriano arrived. Soriano asked Tucker to give him the money, and then he would go get the methamphetamine. Tucker would not agree to that plan, however, and asked Soriano if he had anything with him. Soriano said he had a half-ounce at home and left to go get it. In a third call, this time from Soriano, Soriano indicated that he had a full ounce and asked Tucker and Carreras to meet him at a park by the high school. When Tucker rejected that proposal, Soriano got frustrated and hung up. In a fourth call, this time from Carreras to Soriano, Carreras emphasized that she had the money, that Tucker was "nervous" and would not go to the park, and that if he wanted the money, Soriano should come to the laundromat and get it.[5] When Soriano then returned, Tucker approached his car and asked if he "had it." Soriano responded by showing Tucker a paper towel with a knotted-up, oversized, clear plastic baggie inside. Tucker then gave Soriano $1600 in exchange for the whole package. Shortly thereafter Tucker field-tested the crystalline substance found in the baggie, which tested positive for methamphetamine.[6]

¶ 4 On February 25, 2008, Agent Tucker called Soriano and told him that he wanted to buy an ounce of methamphetamine.[7] Soriano agreed to meet Tucker at the Choctaw Casino in Pocola to do the sale. After more than an hour had passed, Tucker called Soriano and was told that Soriano wouldn't meet at the casino, but that he would meet at Bobo's Convenience Store in Cameron. Tucker agreed to the new location and drove there with Brian Gilham, a Bureau of Indian Affairs agent. Approximately an hour later, Soriano pulled up in a silver extended-cab truck and dropped off a male passenger at the store.[8] Soriano motioned to Tucker to come over to his truck. Tucker declined Soriano's invitation to get in the truck, however, telling him that if he "had it," they could do the exchange right there.[9] Soriano then called the cell phone of the man who had entered the store (identified at trial as Ruben Lobez), who came back out, got in Soriano's truck, took a plastic baggie bindle of a white crystalline substance out of his sock, and gave it to Soriano. Tucker then gave Soriano $1400 in exchange for the bindle. Field-testing again indicated that the crystalline substance inside contained methamphetamine.[10]

¶ 5 On March 17, 2008, Tucker again contacted Soriano and told him that he wanted to buy an ounce of methamphetamine the

---

5. During this conversation, which was recorded, Soriano asks Carreras, "What do you want me to do?" She answers, "Bring it to me Jose. Please? I'm sitting here with the cash. All you gotta do is bring it over here to me Jose." Soriano responds by agreeing to come.

6. The net weight of a plastic evidence bag containing the paper towel with the bag with the crystalline substance inside was 26.37 grams. Subsequent testing revealed the crystalline substance to be 40.0% methamphetamine.

7. Carreras was not involved in Tucker's contacts with Soriano after the second sale. An audio recording of Tucker's side of the conversation during the calls leading up to this third transaction is quite clear and is consistent with Tucker's testimony. In the first call, Tucker asks Soriano if he can "hook him up with an O.Z." (meaning ounce), and in the second call, Tucker asks Soriano if he has "an ounce," to which Soriano responds, "yeah," and they agree to a price of $1400.

8. Tucker testified that the video recording of this third sale, which was admitted at trial, was made by a tiny recorder, which looked like a button on his shirt. The video clearly shows Soriano sitting in his truck, though the audio is not very clear, nor is the exchange visible.

9. The recording of this meeting includes a discussion between Tucker and Soriano about how nice Soriano's truck is and Tucker talking about how he is working on an oil rig by Fort Smith. Tucker complains that he was not able to make any money on the previous "ounce," because he paid $1600 for it. Soriano maintains that he paid $1450 for what he is about to sell Tucker, but then agrees to a price of $1400.

10. The net weight of a plastic evidence bag containing the plastic baggie bindle with the crystalline substance inside was 22.41 grams. Subsequent testing revealed the crystalline substance to be 43.0% methamphetamine.

next day.[11] When Tucker arrived in Poteau (where Soriano lived) on March 18, 2008, he again called Soriano and told him that he "needed an ounce." Soriano responded that it would be a while, and they agreed to meet at the Choctaw Travel Plaza. Tucker and Gilham were waiting at the Travel Plaza when Soriano called and asked Tucker to meet him at a car wash, but Tucker declined. When Soriano eventually arrived at the Travel Plaza and pulled up at the gas pumps, a man (identified at trial as Bradley Williams) got out of Soriano's truck and approached the convenience store. Tucker then approached Soriano, who was standing at the gas pumps, and asked him if he "had it." Soriano responded that he did and called out to Williams, who came back, stood next to Tucker, and then handed Soriano a Marlboro cigarettes package. Soriano showed Tucker that the cigarette package contained a bag of a crystalline substance. Tucker was convinced that the package weighed less than an ounce, however, and argued with Soriano about it being "light" and what the price should be.[12] They eventually agreed on a price of $1200, for whatever amount was there, and completed the sale. Once again, the crystalline substance inside the bag field-tested as positive for methamphetamine.[13]

¶ 6 Counts I through IV were based upon these four methamphetamine sales, in the order that they occurred.[14] Soriano was arrested at his Poteau home on July 1, 2008. Arresting officers did not find any drugs or money on Soriano at the time; nor did a subsequent search of his home lead to the discovery of any drugs or money. In an unrecorded interview after his arrest, Soriano admitted that he had sold Tucker methamphetamine on the dates they had met. When asked why he did not arrest Soriano after the initial sale, Tucker testified, "I always try to carry out a case as far as I can take it," and that he hoped to find out "who else [Soriano] was dealing with, possibly where he was getting his methamphetamine from."

¶ 7 Soriano raises six claims of error. Only one merits full discussion. He argues that his sale of methamphetamine was the product of unlawful entrapment by law enforcement agents. As a subset of that claim he argues that he was the victim of "sentencing entrapment," i.e., that the continuing efforts of the government's agent to buy methamphetamine from him in larger quantities resulted in an unfair increase in his punishment liability.

¶ 8 We conclude the State did not unlawfully entrap Soriano and affirm this judgment and sentence.

## ENTRAPMENT

¶ 9 In Proposition I, Soriano challenges the trial court's refusal to instruct his jury on the law of entrapment, which was his defense at trial. Soriano requested, both orally and in writing, that his jury be instructed according to Oklahoma's uniform jury instructions on entrapment, as well as some additional instructions drafted by his counsel.[15] Soriano also submitted a brief on the entrapment issue, and the trial court held a hearing on the issue during Soriano's trial.

11. In the audio recording of Tucker's side of this conversation, which is quite clear, Tucker tells Soriano he is "going to be down that way tomorrow" and asks if they can "hook up for an O.Z." After Tucker repeats the request, Soriano apparently agrees, and Tucker says he will call him.

12. Although the video recording of this encounter, done with the same tiny device, is not very clear, Tucker can be heard saying that something "feels a little light," and then going back and forth with Soriano until Soriano offers, "give me $1200."

13. The net weight of the Marlboro package, including the bag with the crystalline substance, was 13.53 grams. Subsequent testing indicated that the substance was 9.49% methamphetamine.

14. Soriano was originally charged with an additional methamphetamine trafficking count (Count V), based upon a sale to Tucker on March 31, 2008. This count was dismissed prior to the start of trial, however, when it was determined that the substance sold on this date did not contain any methamphetamine. This final transaction was not mentioned during Soriano's trial.

15. Soriano requested Oklahoma's three uniform instructions on entrapment, OUJI–CR 8–24, 8–25, and 8–26, as well as a modified version of OUJI–CR 8–25 (regarding the burden of proof on entrapment), an instruction defining the term "inducement," and a final instruction listing 14 factors that the jury could consider in deciding the issue of "predisposition."

Soriano maintained that because of the uncontested evidence of "inducement," *i.e.*, the fact that each of the four drug sales was initiated by the State—either through the confidential informant or directly by Tucker—the trial court was required to instruct his jury on entrapment. Soriano emphasized that the jury should be the one who decides whether he was "predisposed" to commit the crimes at issue, as part of its consideration of his entrapment defense. The State maintained that the trial court was not required to instruct on entrapment, arguing that its agents merely provided Tucker an "opportunity" to make drug sales and emphasizing, in particular, that no "trickery" was involved.

¶ 10 After hearing the arguments of both parties, the trial court concluded that entrapment instructions were not warranted because (1) the State's actions in setting up the sales by Soriano did not "rise[ ] to the level of inducement"; and (2) the fact that Soriano sold on four different occasions "in itself creates a predisposition to commit this crime." [16] Thus Soriano's Proposition I claim was adequately preserved and is properly before this Court. We review the trial court's refusal to instruct on the entrapment defense, as requested by Soriano, for an abuse of discretion. [17]

■ ¶ 11 Regarding the meaning and application of the defense of "entrapment," Soriano and the State invoke cases from both this Court and the United States Supreme Court. This Court recognizes that the *content* and interpretation of this defense in Oklahoma is, first and foremost, a matter of state law, so long as no principles of federal or constitutional law are violated. We also recognize, however, that, particularly in more "modern" cases, this Court has often relied upon and invoked the cases of the United States Supreme Court, in defining and interpreting the parameters of Oklahoma's entrapment defense. A review of some of the seminal cases from both the Supreme Court and this Court demonstrates (1) that there

are two fundamentally different approaches to this defense, and (2) that although this Court's early cases took a different approach, this Court has ultimately chosen to follow the approach of the United States Supreme Court and to interpret this defense as more about protecting persons who are "otherwise innocent" of the crime at issue, than it is about controlling "unsavory" or deceitful police conduct.

## I. United States Supreme Court Entrapment Cases

¶ 12 The United States Supreme Court has long recognized the defense of entrapment and has sought to draw a line between the proper action of law enforcement in *revealing* criminal activity (for which the defense is not available) and the improper action of law enforcement in essentially *creating* criminal activity, by a person who would not otherwise have been involved in such activity, for which the entrapment defense is available as a matter of public policy. In *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), the Supreme Court wrote:

It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution.... The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.

16. The trial court noted orally that it was relying, in particular, on the decision in *Anderson v. State*, 1988 OK CR 291, 765 P.2d 1232, in support of its decision. In a separate written order that same day, the trial court rejected Soriano's request for entrapment instructions by finding,

more generally, that "evidence sufficient to raise the defense was not produced."

17. *See, e.g., Hancock v. State*, 2007 OK CR 9, ¶ 98, 155 P.3d 796, 819.

*Id.* at 441–42, 53 S.Ct. at 212–13 (internal citations omitted). Hence the *Sorrells* Court held, as a matter of public policy and implied statutory interpretation, that the "controlling question" regarding the entrapment defense is "whether the defendant is a person *otherwise innocent* whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials." *Id.* at 451, 53 S.Ct at 216 (emphasis added).[18]

¶ 13 In *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958), the Court reaffirmed the holding and rationale of *Sorrells*, noting as follows: "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." The *Sherman* Court described the distinction between proper law enforcement and improper entrapment as follows: "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Id.* at 372, 78 S.Ct. at 821. The *Sherman* Court interpreted this public policy against government seduction of the "otherwise innocent" into criminal activity as so powerful that the Court was willing to reverse the defendant's convictions based upon entrapment—where the facts strongly suggested that were it not for the enticement/persuasion of the government, the defendant would not have been involved in the crime at issue—even though the crime had clearly been committed by the defendant and even though the jury had been instructed on the law of entrapment and rejected the defense.[19] *Id.* at 371–76, 78 S.Ct. at 820–22. The *Sherman* majority, like the *Sorrells* majority, maintained its focus on the character/predisposition of the defendant as the central issue in the entrapment defense, despite strong criticism by concurring Justices.[20]

¶ 14 In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court's theoretical debate over the basis of the entrapment defense—protecting the "otherwise innocent" versus penalizing questionable law enforcement tactics—was taken up yet a third time. Once again, after an extended analysis of the issue by the Court majority and the dissenters, the *Sorrells/Sherman* majority view of entrapment as protecting only the "otherwise innocent" prevailed.[21] The *Russell* Court also recog-

---

18. In *Sorrells*, the Supreme Court reversed the defendant's convictions for possessing and selling whiskey, because his jury was not instructed on the law of entrapment. 287 U.S. 435, 452, 53 S.Ct. 210, 216. The *Sorrells* analysis focused upon the character of the defendant, noting that "defendant had no previous disposition" to commit the crime committed and was "an industrious, law-abiding citizen, and that the agent lured defendant, otherwise innocent, to its commission by repeated and persistent solicitation[,] in which he succeeded by taking advantage of the sentiment aroused by reminiscences of their experiences as companions in arms in the World War." *Id.* at 441, 53 S.Ct. at 212. The *Sorrells* Court acknowledged that the "price" of the entrapment defense would be an examination of the defendant's character and conduct, in order to determine whether he or she was actually "otherwise innocent": "[I]f the defendant seeks acquittal by reason of entrapment[,] he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Id.* at 451, 53 S.Ct. at 216.

19. The *Sherman* Court found entrapment as matter of law, where a confidential informant, who met defendant while they were both seeking treatment for drug addiction, purported to be suffering from withdrawal and repeatedly asked defendant to obtain drugs for him, until the defendant eventually acquiesced. 356 U.S. 369, 371, 78 S.Ct. 819, 820.

20. *Compare Sorrells*, 287 U.S. at 453–59, 53 S.Ct. at 217–19 (Roberts, J., concurring in reversal of convictions, joined by Justices Brandeis and Stone) (arguing that entrapment doctrine should be based upon protecting "purity" of government and courts, by refusing to allow convictions obtained through reprehensible government conduct, regardless of defendant's prior acts or reputation), *with Sherman*, 356 U.S. at 378–85, 78 S.Ct. at 823–27 (Frankfurter, J., concurring in result, joined by Justices Douglas, Harlan, and Brennan) (criticizing majority opinion as lacking sound theoretical basis and arguing that focus of entrapment doctrine should be propriety of police conduct, rather than defendant's character or predisposition). *See also Masciale v. United States*, 356 U.S. 386, 388, 78 S.Ct. 827, 828, 2 L.Ed.2d 859 (1958) (rejecting entrapment appeal where jury rejected defense and evidence was sufficient for jury to find defendant "was ready and willing to search out a source of narcotics and to bring about a sale").

21. *Compare Russell*, 411 U.S. 423, 428–36, 93 S.Ct. 1637, 1641–4 (maintaining primacy of

nized government infiltration and even limited "participation" as an accepted and legitimate means of pursuing those engaged in the manufacture and distribution of illegal drugs: "Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation...." *Id.* at 432, 93 S.Ct. at 1643.[22]

¶ 15 In *Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), the Supreme Court's most recent entrapment case, the Court again reaffirmed its focus on the defendant's character/predisposition as the central issue in entrapment law, but also emphasized that this factual determination must be made by evaluating the defendant before *any* contact with a government agent.[23] The Court held, "Where the Government has induced an individual to break the law and the defense of entrapment is at issue, ... the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Id.* at 548–49, 112 S.Ct. at 1540.

The *Jacobson* majority concluded that although the "56–year–old veteran-turned-farmer" defendant eventually committed the crime of knowingly receiving child pornography—and by that point did have a readiness and willingness to commit this crime—the disposition to commit this crime was *developed* through the repeated and protracted efforts of government agents to entice him into being ready to do so.[24]

¶ 16 The *Jacobson* Court concluded: "When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene." *Id.* at 553–54, 112 S.Ct. at 1543. Hence the Supreme Court continued to focus on an evaluation of the defendant's pre(government-contact)disposition as *the* central issue in determining whether the entrapment defense is available.[25]

## II. The Entrapment Defense in Oklahoma

### A. Early Cases (Pre–1932 *Sorrells* Decision)

¶ 17 In Oklahoma, our entrapment doctrine had a rather different beginning, though it

"predisposition" as central issue in entrapment defense), *with id.* at 436–39, 93 S.Ct. at 1645–46 (Douglas, J., dissenting, joined by Justice Brennan) (preferring approach of concurring Justices Roberts and Frankfurter, in *Sorrells* and *Sherman*, respectively), *and id.* at 439–50, 93 S.Ct. at 1646–52 (Stewart, J., dissenting, joined by Justices Brennan and Marshall) (arguing that "objective" approach of focusing on lawfulness/appropriateness of government conduct is superior to "subjective" approach of focusing on defendant's so-called "innocence").

**22.** In *Mathews v. United States*, 485 U.S. 58, 62, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988), the Court held that a defendant is entitled to have his jury instructed on entrapment whenever there is sufficient evidence from which a jury could find it. The Court noted that the parties "agree as to the basics of the affirmative defense of entrapment" and that the Court "has consistently adhered to the view [of entrapment] first enunciated in *Sorrells* ...." *Id.* at 62–63, 108 S.Ct. at 886.

**23.** In *Jacobson*, the federal government's agents were focused upon child pornography and the then-new Child Protection Act of 1984. 503 U.S. 540, 543, 112 S.Ct. 1535, 1537–38. Like most

cases where entrapment is raised as a defense, the conviction in *Jacobson* arose within the context of a government "sting" operation. *Id.* at 550, 112 S.Ct. at 1541. The Court noted that inducement was not even at issue in the case, since the government acknowledged that it had induced the defendant to commit the crime. *Id.* at 549 n. 2, 112 S.Ct. at 1540 n. 2.

**24.** *Id.* at 542, 550, 112 S.Ct. at 1537, 1541 ("Therefore, although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985." (citing *Sorrells* and *Sherman*)). The *Jacobson* majority concluded that although the defendant's jury had been instructed on the law of entrapment, it could not have rationally concluded that the defendant was predisposed to commit the crime at issue prior to the government's first contact with him. *Id.* at 553, 112 S.Ct. at 1543.

**25.** It should be noted that the *Jacobson* majority and the dissenters did not disagree on the centrality of the predisposition issue, but rather on how this factual question should be decided.

has ultimately reached essentially the same conclusion. Our earliest Oklahoma entrapment cases focused upon the propriety of the *method* (and type of persons) used to catch the defendant, rather than upon whether the defendant was ready and willing to commit the crime at issue; *i.e.*, our earliest cases adopted an approach much like that of the non-majority Justices in *Sorrells, Russell,* and *Sherman.*

¶ 18 In *Shouquette v. State,* 1923 OK CR 311, 25 Okl.Cr. 169, 219 P. 727, this Court reversed the defendant's robbery conviction, where the robbery was instigated, planned, and largely carried out by an informant (described as "an ex-convict and all-around crook"), who was hired by the Oklahoma Bankers' Association to help apprehend bank robbers, even if it meant participating in an actual robbery. 25 Okl.Cr. at 171, 219 P. at 728. This Court determined that "entrapping" someone suspected of planning a crime was usually acceptable, but not when the "decoy" was taking the lead:

> Ordinarily, it is not against public policy for officers to set a trap for one suspected of planning the commission of a crime, and, if he commits the crime, even though aided or encouraged by the officer who laid the trap, the fact that he was so entrapped will be no defense. This rule will not apply, however, where the decoy proposed a robbery, and was the chief moving actor in the forcible taking of the property.

*Id.* at 183, 219 P. at 731; *see also Warren v. State,* 1926 OK CR 410, 35 Okl.Cr. 430, 434, 251 P. 101, 103 ("But when the decoy first suggests, initiates, or induces the commission of the crime, . . . a sound public policy will not uphold a conviction." (citing *Shouquette* )). This Court's earliest entrapment cases reflect a deep concern with the societal implications of encouraging a person to commit a crime, in order to apprehend that person, even if the one encouraged already had "criminal inclinations." The *Shouquette* Court warned: "Persons with criminal inclinations may never commit crime where no favorable opportunities are presented, and

persons of that character should not be encouraged in the commission of crime by private detectives or by officers of the law. The evils resulting from such practice outweigh the good that may be accomplished." 25 Okl.Cr. at 189, 219 P. at 733.

¶ 19 Hence our early Oklahoma entrapment cases focused upon determining whether or not the defendant "initiated" or "instigated" the crime and were quite suspicious of government agents and also private citizens being overly involved in criminal activities, in order to catch would-be criminals. For example, in *Stevens v. State,* 1931 OK CR 360, 51 Okl.Cr. 451, 2 P.2d 282, this Court summarized the law of entrapment as follows:

> "[T]he test of criminality is, Did the officers or those acting under them first suggest the commission of the criminal act or lure the accused into the commission of such acts or perform any of the essential acts constituting the offense? If so, a sound public policy will not uphold a conviction."

*Id.* at 453, 2 P.2d at 283 (quoting syllabus of *Warren* ). And in *Rider v. State,* 1932 OK CR 124, 53 Okl. Cr. 393, 394, 12 P.2d 552, 552, this Court reversed the defendant's conviction for cattle theft, where the only evidence connecting him to the crime was from "an accomplice, a confessed thief and former convict" named Carter (who had tried unsuccessfully to involve the defendant in an earlier theft) and a man named Garrett.[26] The *Rider* Court was greatly disturbed by the role of Garrett, describing him as "an active and official instigator and participant in every essential element of the alleged crime," *id.* at 397, 12 P.2d at 553, and reversed Rider's conviction after quoting from *Shouquette* and *Warren.* *Id.* at 397–99, 12 P.2d at 553–54.

¶ 20 Thus these earliest Oklahoma entrapment cases, which preceded the Supreme Court's 1932 *Sorrells* decision, were more concerned with the role and behavior of those who "entrapped" the defendant than they were with whether the defendant was ready and willing to commit the crime at issue.

---

**26.** Carter originally proposed the theft to Garrett, who got the defendant involved, but who also told the owner of the cattle about the plot.

Garrett then participated in and orchestrated the "theft" with the knowledge and permission of the owner. 53 Okl.Cr. at 394–95, 12 P.2d at 552–53.

## B. Cases from the "Middle Period" (1932–1958)

¶ 21 From 1932 to 1958, however, this Court's entrapment analysis began to include an evaluation of whether or not the defendant was "otherwise innocent," were it not for the actions of others inducing him to crime. Nevertheless, cases from this "middle period" also continued to emphasize the importance of who "initiated" the crime. For example, in *Lee v. State*, 1939 OK CR 82, 66 Okl.Cr. 399, 405, 92 P.2d 621, 623, this Court wrote: "Entrapment is the planning of an offense by an officer and his procurement by improper inducement of its commission by one who would not have perpetrated it except for the trickery or fraud of the officer."[27] And in *Beasley v. State*, 1955 OK CR 44, 282 P.2d 249, this Court formulated a new entrapment jury instruction, which noted the significance of both who initiated the crime and whether or not the defendant was "otherwise innocent."[28]

¶ 22 Cases from this middle period continued to show a significant public policy concern regarding the use of known criminals to entrap persons not previously involved in crime, particularly when the known criminal was the "instigator" of the crime at issue.[29]

Oklahoma cases from this middle period only rarely cited the Supreme Court's 1932 *Sorrells* decision and did not yet adopt its focus on the innocence of the defendant as *the* critical issue in an entrapment analysis.

## C. Post-*Sherman* Cases (1958–present)

¶ 23 After the Supreme Court's 1958 *Sherman* decision, however, this Court began to focus its entrapment decisions almost exclusively on the question of whether the defendant was "ready and willing" or "predisposed" to commit the crime at issue. In *Crosbie v. State*, 1958 OK CR 78, 330 P.2d 602, decided just a few months after *Sherman*, this Court stated that it "reaffirm[ed] the principles of law" found in early cases, such as *Shouquette* and *Rider*. *Id.* at ¶¶ 11–13, 330 P.2d at 605. Yet the *Crosbie* Court then relied instead upon two more "recent cases," which focused upon the origin of the defendant's "intent to commit a crime" and whether the defendant was a person "who would not have perpetrated [the crime], except for the trickery of an officer." *Id.* at ¶¶ 13–14, 330 P.2d at 605–06 (quoting *Ryles*, 1956 OK CR 115, ¶ 5, 303 P.2d 449, 452, and

---

27. *See also Bayouth v. State*, 1956 OK CR 26, ¶ 38, 294 P.2d 856, 863–64 (same (quoting *Lee* )); *Finley v. State*, 1947 OK CR 67, 84 Okl.Cr. 309, 330, 181 P.2d 849, 860 ("If the decoy suggests or initiates or induces the commission of the crime, or artificially propagates the crime or lures *an otherwise innocent person* to commit the crime . . ., a conviction cannot be had on such a basis for that is entrapment." (emphasis added)); *see also Ryles v. State*, 1956 OK CR 115, ¶ 4, 303 P.2d 449, 452 (no entrapment instructions required where "record fails to disclose any evidence on the part of the enforcement officers tending to induce the defendant to commit the crime").

28. This new entrapment jury instruction included the following language:

[I]f you believe from the evidence that the officers, or persons acting under the direction of the officers, or any other persons with a corrupt private purpose to serve, first suggested the commission of the criminal act, or did first lure the accused into the commission of such acts, he being an otherwise innocent person, then and in that event, it will be your duty to hold for the defendant and acquit him.

*Beasley*, 1955 OK CR 44, ¶ 15, 282 P.2d 249, 254. This instruction was intended to replace an earlier instruction, which though "upheld in many cases," focused only upon who initiated the crime. *Id.* at ¶ 7, 282 P.2d at 251.

29. In *Wooten v. State*, 1940 OK CR 115, 70 Okl.Cr. 292, 106 P.2d 132, this Court reversed the defendant's larceny conviction because the trial court refused to instruct on the law of entrapment, where the record suggested that the defendant had been pushed into the cattle theft by Fat Cummings, "a former convict who had served several terms in the penitentiary, one for the larceny of cattle." *Id.* at 294, 106 P.2d at 133. The *Wooten* Court emphasized that Cummings was "the instigator of the plan and scheme for the defendant to commit the larceny." *Id.* at 298, 106 P.2d at 134. The Court recognized that adequate evidence existed to support the defendant's conviction, but also that "it is very doubtful if this defendant ... would have ever conceived the idea of committing this crime unless encouraged in the commission of the same by the witness Cummings." *Id.* at 300, 106 P.2d at 135. The *Wooten* Court emphasized the public policy concerns expressed in our early entrapment cases, including the concern with enticing those with "criminal inclinations." *See id.* at 297–300, 106 P.2d at 134–35 (citing cases, including *Shouquette, Warren,* and *Rider* ).

*Savage v. State*, 1956 OK CR 112, 304 P.2d 344 (syllabus) respectively).

¶ 24 The *Crosbie* Court found that the defendant was not entrapped into the crime of practicing dentistry without a license, because the privately-arranged informant "did not have to use persuasion or inducements to obtain an appointment for dental work" and because the defendant had an office set up for such work and was "prepared to perform like services for any customer who might appear." *Id.* at ¶ 15, 330 P.2d at 606. Hence the Court concluded that because the defendant was ready and willing to break the law at issue, thereby showing that the "intent to violate the statute in question originated in the mind of the defendant," the defendant was not entrapped. *Id.*

¶ 25 Subsequent cases from this Court continued to focus upon whether the defendant was ready and willing to violate the law as the critical issue in entrapment analysis.[30] And in *Dupree v. State*, 1973 OK CR 53, 506

P.2d 974, this Court approved an entrapment jury instruction that focused almost entirely on whether the defendant had the "intent and design" to commit the offense at issue and refused to find that the trial court erred by declining to give the instruction approved in *Beasley*, which focused on who "first suggested" the criminal act and did not address the defendant's readiness to commit the crime.[31] *Id.* at ¶¶ 7–8, 506 P.2d at 976–77.

¶ 26 Hence since at least 1958, this Court's approach to the entrapment defense has consistently followed or paralleled the approach of the United States Supreme Court. Furthermore, this Court, like the Supreme Court, has been willing to reverse convictions—even where a jury *rejected* the entrapment defense—and find entrapment as a matter of law, where the facts strongly suggest that an innocent person was unfairly lured or pressured into committing a crime that he or she otherwise would not have committed.[32]

---

30. *See, e.g., Riddle v. State*, 1962 OK CR 98, ¶ 27, 374 P.2d 634, 638 ("It is apparent in the case at bar the criminal design did not originate with the state agent, but he did give the defendant the opportunity to commit the offense. Moreover, this record does not present the defendant as an otherwise innocent person."); *Robinson v. State*, 1973 OK CR 152, ¶ 12, 507 P.2d 1296, 1299 ("[T]he real issue in this case is whether the defendant had the criminal intent to obtain marijuana without inducements or undue pressure or exertion on the part of law enforcement officers or their agents."), *overruled in part by McInturff v. State*, 1976 OK CR 226, 554 P.2d 837 (discussed *infra*); *Grate v. State*, 1974 OK CR 229, ¶ 14, 529 P.2d 1001, 1004 (finding that undercover agent and informant "originated the criminal design and implanted it in the mind of an innocent person who lacked the predisposition to commit the crime charged"); *Kiddie v. State*, 1977 OK CR 301, ¶¶ 20–21, 574 P.2d 1042, 1047–48 (jury properly rejected entrapment defense where "not only did the defendant significantly participate in the scheme which brought him to trial," he "possessed the propensity and the intent to defraud an insurance company"); *Carney v. State*, 1984 OK CR 58, ¶ 5, 679 P.2d 1303, 1304 ("Even if induced to commit the crime, [a defendant] may not avail himself of the [entrapment] defense if he otherwise were predisposed to commit it.").

31. The *Dupree* Court found that the instruction given by the trial court "contains a clear and correct statement of the laws of entrapment," rejecting the defendant's contention that it "overstate[d] the negative aspects of entrapment" and

did not accurately state the law. 1973 OK CR 53, ¶ 8, 506 P.2d at 977. The approved jury instruction, which was quite long, stated in part;

Therefore, if you find the defendant was induced or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime which he had otherwise no intention of committing, then in that event, it will be your duty to hold for the defendant and acquit him . . . .
Accordingly, entrapment is not available as a defense to a person who has the intent and design to commit a criminal offense and who in fact does commit the essential acts constituting it, merely because an officer of the law, in his effort to secure evidence against such person, affords him an opportunity to commit the criminal act, or purposely places facilities in his way or aids and encourages him in the perpetration thereof. . . .

*Id.* at ¶ 7, 506 P.2d at 976–77.

32. *See, e.g., Striplin v. State*, 1972 OK CR 175, ¶¶ 14–15, 499 P.2d 446, 449–50 (finding entrapment where confidential informant asked defendant to sell drugs to narcotics officer on his behalf, supplied LSD tablets, and kept the proceeds, and where defendant had no convictions and no evidence of prior drug sales); *Grate*, 1974 OK CR 229, ¶¶ 14–16, 529 P.2d at 1004–05 (finding entrapment where confidential informant, who was suffering from obvious withdrawal symptoms, begged defendant to get her heroin, defendant did not profit from sale, no evidence of prior drug involvement, and defendant attempted to convince officer to leave heroin alone); *Slagel*

### D. Proving Entrapment

¶ 27 This Court's post–*Sherman* cases have also repeatedly recognized that where evidence is conflicting or where different inferences can be drawn from the evidence, whether or not the entrapment defense has been established is a jury question.[33] And in this Court's 1976 decision in *McInturff*, we clarified that where trial evidence adequately raises the issue of entrapment, the State has the burden to prove, beyond a reasonable doubt, that the defendant was not entrapped. *McInturff v. State*, 1976 OK CR 226, ¶¶ 11–12, 554 P.2d 837, 840–41 (overruling prior cases to the contrary). These cases have likewise consistently recognized that a defendant does not have to testify or put on any witnesses or evidence to adequately raise the entrapment defense. The defense *can* be raised entirely through cross-examination of State witnesses, *if* this testimony can be interpreted to establish entrapment.[34] Such cases are in accord with the Supreme Court's decision in *Sherman*, where the Supreme Court held that the defendant had established entrapment as a matter of law, even though all the evidence in support of this defense was brought out through cross-examination of the government's witnesses.[35]

¶ 28 On the other hand, this Court has also recognized that where no trial evidence actually supports the defendant's entrapment defense—or where trial evidence conclusively demonstrates that the defendant was predisposed to commit the crime at issue—a trial court can properly decline to instruct the jury on this defense.[36] In *Johnson v. State*,

1981 OK CR 31, 625 P.2d 1270, this Court recognized that "the defense of entrapment is well established in American law," *id.* at ¶ 8, 625 P.2d at 1272 (citing *Sorrells* and *Sherman*), but affirmed the trial court's refusal to instruct on entrapment where "a close reading of the transcript does not reveal any testimony raising the issue of entrapment." *Id.* at ¶ 9, 625 P.2d at 1272. The *Johnson* Court noted that "[t]he mere fact that defense attorneys *propound questions* concerning entrapment during cross examination is by itself insufficient to establish the necessary factual and concrete evidentiary disagreement which requires a jury instruction for its resolution." *Id.* (emphasis added). Cases subsequent to *Johnson* have often invoked this principle, *i.e.*, that cross-examination questions *alone* are not enough to raise the entrapment defense.[37] Yet none of these cases have held or implied that the defense *cannot* be adequately raised through cross-examination alone. Instead, the question remains whether any of the evidence presented at trial, including the answers of government witnesses during cross-examination, could be interpreted to establish the entrapment defense.

### E. Lies, Tricks, Deception, & Government Stings

█ ¶ 29 Although early Oklahoma entrapment cases expressed great discomfort with the use of known "convicts" and "crooks" to catch individuals in the act of committing a crime, and also with government and private actors "instigating" or "ini-

---

*v. State*, 1988 OK CR 284, ¶¶ 3–11, 766 P.2d 355, 356–57 (finding entrapment where defendant had no prior record or known involvement in drug-selling and apparently sold marijuana, on single occasion, as favor to confidential informant, who supplied the marijuana and kept $500 proceeds).

33. *See, e.g., Riddle*, 1962 OK CR 98, ¶ 23, 374 P.2d at 638–39; *Robinson*, 1973 OK CR 152, ¶ 12, 507 P.2d at 1299; *Disheroon v. State*, 1973 OK CR 405, ¶ 7, 514 P.2d 685, 688; *see also Hunnicutt v. State*, 1988 OK CR 91, ¶ 3, 755 P.2d 105, 107–08.

34. *See, e.g., Disheroon*, 1973 OK CR 405, ¶¶ 6–7, 514 P.2d at 688 (entrapment question "properly submitted to the jury," because evidence was

"controverted," even though defense "rested without the presentation of evidence"); *McInturff*, 1976 OK CR 226, ¶ 10, 554 P.2d at 840.

35. *See Sherman*, 356 U.S. 369, 373, 78 S.Ct. 819, 821 ("We reach our conclusion from the undisputed testimony of the prosecution's witnesses.").

36. *See, e.g., Anderson v. State*, 1974 OK CR 112, ¶ 13, 523 P.2d 1099, 1101 (affirming refusal to instruct on entrapment where trial evidence established that "agents merely provided an opportunity for the defendant to commit the crime").

37. *See, e.g., Abbott v. State*, 1983 OK CR 46, ¶ 5, 661 P.2d 914, 916; *Anderson v. State*, 1988 OK CR 291, ¶ 9, 765 P.2d 1232, 1234; *Cooper v. State*, 1991 OK CR 54, ¶ 4, 810 P.2d 1303, 1305.

tiating" criminal activity, over time this Court has entirely shifted the focus of its entrapment doctrine to focus more upon *who* is being "entrapped," rather than *how* it is being done.[38] Hence this Court has increasingly adopted the approach of the United States Supreme Court, which has long recognized that in order to detect and prosecute criminal activity, government agents will often have to "trick" and "deceive" the individuals involved in such activity.[39]

¶ 30 In cases after 1932, in particular, this Court began to recognize the appropriateness of using some amount of "artifice" to catch criminals.[40] And recent cases demonstrate this Court's recognition of the legitimate role of even prolonged and elaborate "sting" operations in the detection and prosecution of crime.[41] This Court's increased willingness to condone the use of known criminals (now generally described as "confidential informants") to catch other criminals and its recognition that government sting operations (in which government agents regularly initiate or instigate particular criminal transactions) are a necessary tool for law enforcement have coincided with this Court's doctrinal shift in the focus of Oklahoma entrapment law.

¶ 31 Trickery and deceit are natural and inherent parts of any sting operation. The government agents and informants directly involved in such stings are often misrepresenting their true identities, and they are *always* misrepresenting their true intentions, *i.e.*, they are purporting to be willing participants in a crime, when they are actually trying to "catch" the target in the commission of that crime, in order to apprehend, prosecute, or perhaps use that target in a future sting. Hence the entrapment question is more about what kind of *person* the government has set out to catch, and whether that person was already ready and willing (*i.e.*, "predisposed") to commit the crime at issue when he or she was first approached, than it is about whether the government tricked or deceived that target. The public policy behind the entrapment defense is meant to discourage the government from corrupting the innocent (otherwise law-abiding citizens) in its legitimate quest to apprehend and prosecute the wicked (those who are already violating or already ready and willing to violate the law at issue). This Court notes that Oklahoma's current uniform instruction, OUJI–CR(2d) 8–25 (Supp. 2005), accurately and succinctly captures the true nature of our modern entrapment defense.[42]

38. Nevertheless, this Court still recognizes the danger that some techniques and/or unscrupulous actors could inappropriately entrap the unwary innocent, rather than the unwary criminal. The entrapment defense remains fully available for factual situations that could fit in this category.

39. See *Sorrells*, 287 U.S. 435, 441, 53 S.Ct. 210, 212 ("Artifice and stratagem may be employed to catch those engaged in criminal enterprises."); *Jacobson*, 503 U.S. 540, 548, 112 S.Ct. 1535, 1540 (same (quoting *Sorrells* )); *see also Sherman*, 356 U.S. at 372, 78 S.Ct. at 820–21 ("Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer.").

40. See, e.g., *Lee*, 1939 OK CR 82, 66 Okl.Cr. at 405, 92 P.2d at 624 ("In view of the well-known facts that criminals usually work in secrecy and that some unlawful practices are encouraged and protected by a large class of citizens, it often becomes necessary to resort to various artifices in order to enforce the law and punish its violation." (internal citation omitted)); *Beasley*, 1955 OK CR 44, ¶ 9, 282 P.2d at 252 ("Artifice and stratagem may lawfully be employed to catch

those engaged in the commission of crime . . . ." (citation omitted)).

41. See, e.g., *Dodd v. State*, 1994 OK CR 51, ¶¶ 2, 18–19, 879 P.2d 822, 824, 827 (rejecting entrapment claim on convictions that "were the result of a lengthy sting operation").

42. OUJI–CR(2d) 8–25 (Supp. 2005) states as follows:

Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers to commit a crime, he/she is entitled to the defense of entrapment, because the law as a matter of policy forbids a conviction in such a case.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that a police officer provides what appears to be a favorable opportunity is no defense.

If you should find from the evidence that, before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit a crime such as that charged in the information whenever opportunity was offered and the police

¶ 32 In drug cases, in particular, this Court has repeatedly recognized that a trial court can properly decline a defense request to instruct the jury on entrapment where the evidence brought out at trial adequately establishes that the defendant was predisposed to commit the offense at issue.[43] In *Anderson v. State*, 1988 OK CR 291, 765 P.2d 1232, an informant set up a sale of Demerol to an undercover agent at the informant's trailer. When the defendant arrived, the agent asked, "Do you have it?" and the defendant produced a prescription bottle of Demerol, negotiated the price with the agent, and then sold him the pills. *Id.* at ¶ 2, 765 P.2d at 1232–33. We concluded that in this very simple sting operation, the trial court correctly refused to instruct on entrapment. We found that the State had "merely afforded the appellant the opportunity to commit the crime, and did not in any manner persuade or pressure him to do so." *Id.* at ¶ 9, 765 P.2d at 1234.[44]

¶ 33 Furthermore, in *Reyes v. State*, 1988 OK CR 50, 751 P.2d 1081, another drug sting case, this Court recognized that the entrapment defense is not intended for the *wary* criminal any more than it is for the "unwary criminal." The defendant in *Reyes*, who was convicted of unlawful delivery of the prescription drug Preludin, was "very concerned" that the State's confidential informant was involved with the police and "threatened to kill him if he had set her up." *Id.* at ¶ 5, 751 P.2d at 1083. The defendant also "carefully removed the prescription label with her name on it," before selling her container of diet pills to the undercover officer. *Id.* These facts, which along with other

evidence suggested that the defendant knew that what she was doing was illegal and was wary of being *caught*—though not concerned with the legality or appropriateness of what she was doing—contributed to this Court's conclusion that the trial court did not err in failing to instruct the defendant's jury, *sua sponte*, on entrapment. *Id.* at ¶¶ 4–5, 751 P.2d at 1082–83. This Court again concluded that "[w]hether requested or not, an instruction on the defense of entrapment is required only if the evidence presented sufficiently raises the issue." *Id.* at ¶ 4, 751 P.2d at 1082.

¶ 34 In *Jacobson*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174, the Supreme Court's most recent entrapment case, the Court recognized that in most drug cases, the very fact that the defendant readily commits the crime at issue itself adequately demonstrates his/her predisposition to do so, thereby eliminating the possibility of showing entrapment. The Court wrote:

> Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs and, if the offer is accepted, make an arrest on the spot or later. *In such a typical case, or in a more elaborate "sting" operation* involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, *the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition.*

*Id.* at 549–50, 112 S.Ct. at 1541 (emphasis added). The *Jacobson* Court recognized that

merely offered the opportunity, the defendant is not entitled to the defense of entrapment.
 If, on the other hand, you should find that the defendant had no previous intent or purpose to commit any offense of the character here charged, and did so only because he/she was induced or persuaded by some agent of the police, then the government has seduced an innocent person, and the defense of entrapment is a good defense.

43. *See, e.g., Anderson*, 1974 OK CR 112, ¶ 13, 523 P.2d 1099, 1101 (affirming refusal to instruct on entrapment in LSD distribution case, where "defendant admit[ted] he had possession of the drugs and that he had possession for his own use and distribution to his friends"); *Johnson*, 1981

OK CR 31, ¶ 2, 625 P.2d 1270, 1271 (affirming refusal to instruct on entrapment, where defendant responded to undercover agent's inquiry about availability of Preludin by telling him to come back in 30 minutes, and sale to agent was completed 30 minutes later); *Abbott*, 1983 OK CR 46, 661 P.2d 914 (affirming refusal to instruct on entrapment in unlawful delivery case).

44. *See also Giles v. State*, 1984 OK CR 26, ¶ 4, 675 P.2d 441, 442 (affirming refusal to instruct on entrapment, in simple, sting marijuana-purchase case, based on same analysis); *Cooper*, 1991 OK CR 54, ¶ 4, 810 P.2d 1303, 1305 (same in unlawful delivery of cocaine and marijuana case).

in such situations, where a defendant would be presumed to know that the proposed act violates the law, but nonetheless "promptly avails" himself/herself of the opportunity presented, it is "unlikely" that a defendant's entrapment defense would even "warrant[ ] a jury instruction." *Id.* at 550, 112 S.Ct. at 1541. This Court agrees.[45]

■ ¶ 35 Consequently, this Court recognizes that in situations like the current case, where a defendant readily agrees to commit the crime at issue, where it can be reasonably assumed (as it can in the illegal drug context) that the defendant would know that the proposed act is illegal, and where there is no evidence suggesting that the defendant is an "unwary innocent" who is being unfairly enticed or duped into the crime at issue, trial courts can properly decline to give any instructions on entrapment. In such situations, absent countervailing evidence suggesting the defendant's unpreparedness or unwillingness to commit the crime at issue, the very commission of the criminal act, by itself, adequately establishes the defendant's predisposition—thereby defeating the entrapment defense.

■ ¶ 36 It is the trial court's job to properly instruct the jury on the applicable law at trial, based on the evidence presented at trial.[46] In the context of affirmative defenses like entrapment, the trial court is required to instruct on the defendant's chosen defense when evidence has been introduced at trial that adequately raises that defense, *i.e.*, when the evidence presented at trial, regardless of its source, could be interpreted to establish a prima facie case of that defense.[47] Regarding entrapment, the trial

court need not instruct on this defense where the totality of the evidence presented at trial could not be reasonably interpreted to establish that the defendant was entrapped. Hence entrapment instructions need not be given where trial evidence clearly establishes that the defendant was "predisposed" to commit the crime at issue. This Court will not reverse a trial court's decision regarding such an instruction unless we find that the trial court abused its discretion by declining to give the instruction.[48]

■ ¶ 37 In the current case, the trial court did not err in declining Soriano's request to instruct his jury on the law of entrapment. This Court has thoroughly reviewed the evidence presented at trial, and we find that the totality of the evidence clearly established that Soriano was indeed predisposed to commit the drug crimes for which he was convicted. Soriano correctly notes that he had no prior convictions, that in each of the four transactions, it was the State's undercover officer or the confidential informant who initiated the drug sale, and that no money or drugs were found on his person or in his home when he was eventually arrested. Such facts *can* be supportive of a defendant's entrapment defense and must be considered by the trial court in evaluating whether to instruct the jury on this defense. However, in a case like the current one, where there is no evidence that the defendant showed any hesitation or reluctance to engage in the crime at issue when given the opportunity to do so, *i.e.*, that the defendant readily engaged in the (obviously) criminal activity proposed without any need for substantial pressure or persuasion, the defen-

---

45. *Cf. Riddle*, 1962 OK CR 98, ¶¶ 23–24, 374 P.2d at 639 (declining to reverse jury decision rejecting entrapment defense where defendant "readily" pursued "the opportunity to make a [drug] sale" and then "consummated the crime in all its essentials").

46. *See Atterberry v. State*, 1986 OK CR 186, ¶ 8, 731 P.2d 420, 422 ("In a criminal prosecution, the trial court has the duty to correctly instruct on the salient features of the law raised by the evidence ...." (citation omitted)); *Hogan v. State*, 2006 OK CR 19, ¶ 39, 139 P.3d 907, 923 (same (citing *Atterberry* )); *Hancock v. State*, 2007 OK CR 9, ¶ 98, 155 P.3d 796, 819 (same (quoting *Hogan* citing *Atterberry* )). This Court noted in

*Atterberry* that "[a]n instruction should not be given on any question of law which is not applicable to the evidence," but that "the trial judge should instruct on the essential elements of the offense," and that the court's instructions "should conform to the charge and to the defense and testimony." 1986 OK CR 186, ¶ 8, 731 P.2d at 422 (all citations omitted).

47. *See Malone v. State*, 2007 OK CR 34, ¶ 22, 168 P.3d 185, 196–97.

48. *See, e.g., Hancock*, 2007 OK CR 9, ¶ 98, 155 P.3d at 819.

dant's predisposition to commit the crime has been established, thereby defeating any entrapment defense.

 ¶ 38 The fact that Soriano had to be persuaded/pressured to meet Tucker and Carreras at the location they selected for a particular drug exchange (the laundromat), rather than at the location of his choice (the park), is not relevant to the predisposition issue in this case. Soriano did not have to be pressured or persuaded to sell methamphetamine to Tucker. Soriano readily agreed to the opportunity to commit this crime on each occasion that it was offered—though sometimes it would take him a while to get to the agreed meeting spot, and he did not always provide as much methamphetamine as he was purporting to provide. Furthermore, in the current case, rather than supporting an entrapment claim, Soriano's actions in trying to change or control the meeting place where the drug exchanges would take place tended to demonstrate that he was an experienced and somewhat wary (*i.e.*, cautious) criminal, without at all suggesting that he was a wary or unwary "innocent." Although some of the trial court's initially-stated reasons for declining to instruct Soriano's jury on entrapment are not in accord with the analysis herein, the trial court's decision to reject the proffered instructions and the court's finding that the evidence presented at trial was not "sufficient to raise the defense" are both correct.[49]

## F. Sentencing Entrapment

 ¶ 39 Within his Proposition I claim, Soriano also raises a secondary claim of "sentencing entrapment." In essence, Soriano is arguing that even if he was predisposed to sell methamphetamine, the trial evidence did not establish that he was predisposed to sell methamphetamine *in trafficking quantities*. In *Leech v. State*, 2003 OK CR 4, ¶ 12, 66 P.3d 987, 990, this Court recognized "sentencing entrapment" as a viable defense under Oklahoma law. We defined this defense as applying to situations where "the defendant, although intending to commit a lesser offense, has been entrapped into committing a greater offense."[50] We further recognized that drug-related crimes—where the amount of the drug that is possessed, distributed, manufactured, *etc.*, often has a determinative and powerful impact regarding both the crime charged and the potential sentence—are a context in which sentencing entrapment can certainly occur and also that a defendant is entitled to have his jury instructed on this defense where the facts presented at trial support it.[51]

¶ 40 Although Soriano orally requested that his jury be instructed on sentencing entrapment and cited *Leech*, he did not proffer a written instruction on this defense, and the trial court declined his request. We find that the trial court properly declined to instruct Soriano's jury on sentencing entrapment. Although it was Tucker who first proposed that Soriano sell him an "ounce" or "O.Z." of methamphetamine, and who continued asking Soriano to sell him this amount in subsequent sales, Soriano never once showed any hesitation about selling this much, nor did he ever have to be pressured or persuaded to sell this "trafficking quantity" of methamphetamine.[52] Hence, once again, the fact

**49.** As explained herein, whether the State "induced" or instigated the drug sales is no longer a significant factor in our modern entrapment jurisprudence; nor is the number of times that a particular crime is committed dispositive of the predisposition issue. As the Supreme Court recognized in *Jacobson*, the predisposition question must be decided by evaluating the defendant's readiness to commit the crime "prior to first being approached by Government agents," regardless of how many times the defendant may have later committed the crime at issue. 503 U.S. at 549, 112 S.Ct. at 1540.

**50.** 2003 OK CR 4, ¶ 10, 66 P.3d at 990; *see also Watts v. State*, 2008 OK CR 27, ¶ 13, 194 P.3d

133, 138 (recognizing defense and quoting *Leech*).

**51.** *Leech*, 2003 OK CR 4, ¶¶ 12–13, 66 P.3d at 990; *Watts*, 2008 OK CR 27, ¶ 13, 194 P.3d at 138.

**52.** The fact that Soriano did not actually *provide* an ounce of methamphetamine on the fourth sale and the fact that the "quality" of the methamphetamine he provided (in terms of purity) was quite variable do not change the fact that Soriano clearly had the predisposition and intent to engage in sales of methamphetamine in trafficking quantities. The fact that he was also apparently defrauding his buyer, by not providing the

that Soriano readily agreed to sell the (trafficking) quantity of methamphetamine sought, along with his demonstrated ability to do so, establishes his predisposition to commit the trafficking offenses (Counts II and III) and thereby defeats his sentencing entrapment challenge on these counts. Hence Soriano's claims in Proposition I are rejected entirely.

¶ 41 In Proposition II, Soriano asserts that a particular statement during the testimony of Agent Tucker constituted an improper "evidentiary harpoon," for which defense counsel's request for a mistrial should have been granted.[53] This court notes that the current challenge was not adequately preserved, since Soriano objected based on hearsay, not "harpoon." In addition, the trial court cured any prejudice resulting from this single remark by striking it and instructing the jury to disregard it.[54] We also note that the prosecutor's next question was: "How did you come to know Mr. Soriano?" to which Tucker responded, "I was the case agent on an investigation into drug trafficking of Jose Soriano." No objection was made to this testimony, nor does Soriano raise it within his current challenge.[55] This

Court finds that there is no plain error, that Soriano has failed to establish an "evidentiary harpoon," and, in particular, that he has utterly failed to show prejudice resulting from the challenged testimony.[56] Proposition II is rejected accordingly.

¶ 42 In Proposition III, Soriano challenges the trial court's refusal to let him cross-examine Agent Tucker about the prior felony convictions of his confidential informant, Georgina Carreras. Soriano adequately preserved this claim at trial. Nevertheless, Soriano presents no relevant authority in support of his claim and no cogent explanation of why he should have been allowed to impeach the credibility of *Tucker* via the prior convictions of Carreras—who both the State and Soriano chose not to call as a witness. The trial court's ruling did not improperly impair Soriano's ability to present his defense, nor did it unfairly limit his ability to challenge Tucker's credibility.[57] Proposition III is rejected accordingly.

¶ 43 In Proposition IV, Soriano asserts that the trial court improperly admitted Tucker's testimony that during an unre-

amount promised (or the quality expected), does not by any means suggest, in the context of this case, that Soriano was entrapped—though it did lessen his crime and sentence on Count IV, since Soriano was charged and convicted for the amount he actually sold, rather than the ounce he agreed to sell.

53. The challenged remark occurred during Tucker's introductory direct testimony, in response to the following question: "How did you come to be familiar with Mr. Soriano?" Tucker answered, "In early of 2007, we—I began giving [sic] complaints that Mr. Soriano was dealing drugs." Defense counsel immediately objected, arguing that he could not "cross-examine those people." The prosecutor agreed that the testimony about "complaints" was improper. The trial court ruled that the statement contained inadmissible hearsay, ordered it stricken from the record, and instructed the jury to disregard it—but rejected defense counsel's request for a mistrial.

54. *Scott v. State*, 1991 OK CR 31, ¶ 8, 808 P.2d 73, 76.

55. Soriano has also failed to challenge, both at trial and on appeal, Tucker's cross-examination testimony that he "didn't try to induce [Soriano] to sell drugs. He was already selling drugs."

56. *See Myers v. State*, 2006 OK CR 12, ¶ 27, 133 P.3d 312, 324 (when specific, trial-court objection is different than challenge on appeal, review only for plain error); *see also Scott*, 1991 OK CR 31, ¶ 6, 808 P.2d at 76 (reviewing six characteristics of evidentiary harpoons).

57. This Court notes that Soriano's jury would *not* likely have been surprised to learn that Carreras had prior convictions. Tucker initially testified about how confidential informants are used to "make a first contact" with people who are selling drugs and also that he had "reason to believe that [Carreras] had been involved in methamphetamine." Tucker later testified that Carreras was "in drug court" and that she wanted him to "help her get her drug court transferred closer to where she lived," from which a jury could infer she had a drug case. Finally, during cross-examination defense counsel asked Tucker, "Would it be common practice for you to use a confidential informant that had five prior felony convictions?"—to which Tucker responded that it was "very common" to use confidential informants with felony convictions, "because that's who drug traffickers and drug dealers are surrounding themselves by."

corded, post-arrest interview at the police station, Soriano confessed to selling methamphetamine to Tucker.[58] Soriano raised no challenge to this testimony at trial, nor did he seek a pre-trial hearing regarding the voluntariness of his confession. Hence Soriano failed to properly preserve his claim in the trial court. This Court finds no plain error in the admission of Tucker's testimony about Soriano's confession.[59] Although Soriano also argues that this Court should require, as a matter of policy, that all custodial interrogations be videotaped/recorded, we decline to consider this claim in a case where the defendant did not even preserve his challenge in the trial court. Proposition IV is rejected accordingly.

¶ 44 In Proposition V, Soriano raises a prosecutorial misconduct claim and specifically challenges two particular statements. First, Soriano asserts that the prosecutor "misstated the facts" during his opening statement—when he stated that at the conclusion of the investigation, the evidence was submitted to the OSBI crime laboratory, which "tested the substance," weighed it, and determined "it was all methamphetamine." Second, Soriano asserts that the prosecutor made an "inappropriate comment" during closing argument—when he suggested Tucker had testified that he "had been investigating for about a year before he found someone that could get close to Mr. Soriano." Soriano did not challenge either of these prosecutorial assertions at trial; hence we review these prosecutorial misconduct claims only for plain error.[60]

¶ 45 Regarding his first challenge, Soriano maintains that it was false for Tucker to assert that the tested evidence was "all methamphetamine," because the substance

he sold to Tucker on March 31, 2008, did not actually contain any methamphetamine. Soriano's March 31 sale of white powder to Tucker was originally charged as an additional trafficking count, i.e., Count V, but this count was dropped prior to trial, when it was determined that no actual illegal drugs were contained in the substance sold. This sale was never mentioned at Soriano's trial. This Court notes that the challenged statement occurred after the prosecutor had just summarized the four counts charged against Soriano and the transactions on those four dates. Hence it was not at all false or misleading for the prosecutor to then state that when the evidence was tested, it was "all methamphetamine."[61] The prosecutor's statement was not improper, nor was Soriano prejudiced by it. Regarding his second challenge, Soriano totally fails to establish that the prosecutor's assertion that he had been investigating Soriano for "about a year" constituted prejudicial misconduct. Although this particular assertion was not supported by specific trial testimony, it was consistent with trial testimony; and it is highly unlikely that the jury was influenced by this fleeting remark, in light of all the evidence properly before it in support of the four charged counts. This Court finds that neither of the challenged remarks, nor the combination of these remarks, were such that they came anywhere near to depriving Soriano of a fair trial.[62] Proposition V is rejected accordingly.

¶ 46 In Proposition VI, Soriano raises a cumulative error claim. Yet this Court has not found error within any of Soriano's claims. Hence Soriano's Proposition VI cumulative error claim is likewise rejected accordingly.

**58.** Tucker testified that after his July, 1, 2008, arrest, Soriano "admitted that—that the times that we had met that he sold me the narcotics, the methamphetamine."

**59.** *Wilson v. State*, 1998 OK CR 73, ¶¶ 64–65, 983 P.2d 448, 464.

**60.** *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (consider whether challenged conduct made trial "so fundamentally unfair as to deny [defendant] due process"); *Darden v. Wainwright*, 477 U.S. 168,

181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (quoting *DeChristoforo* )).

**61.** Soriano could have chosen to question Tucker about the additional sale of (fake) methamphetamine, but it is not surprising that he chose not to do so.

**62.** *See Brewer v. State*, 2006 OK CR 16, ¶ 13, 133 P.3d 892, 895 (citations omitted).

¶ 47 We find that neither reversal nor modification of Soriano's convictions and sentences is required by the law and evidence.

### Decision

¶ 48 The Judgment and Sentence of the district court is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LEWIS, V.P.J., LUMPKIN, C. JOHNSON and SMITH, JJ.: concur.